**WYNDHAM INTERNATIONAL, INC., Appellant**

**v.**

**ACE AMERICAN INSURANCE CO., Caliber One Indemnity Co., Essex Insurance Co., Global Excess Partners LLC, Certain Underwriters at Lloyd's London, Marsh USA, Inc., Royal Surplus Lines Insurance Co., Westchester Fire Insurance Co., Westchester Surplus Lines Insurance Co., United States Fire Insurance Co., and Zurich American Insurance Co., Appellees.**

**No. 05–04–01443–CV.**

Court of Appeals of Texas, Dallas.

March 10, 2006.

John J. Little, Little, Pederson & Frankhauser, L.L.P., Dallas, for Appellant.

Emery Lawrence Vincent, Susman Godfrey L.L.P., Dallas, Stephen Patrick Pate, Fulbright & Jaworski, LLP, Houston, William Stephen Boyd, Hunton & Williams LLP, Michael P. Lynn, Esq., Lynn Tillotson & Pinker, L.L.P., Stephen Edward Haynes, Zelle Hoffman Voelbel Mason & Gette, Bart Wulff, Jackson Walker, L.L.P., George L. Lankford, Fanning Harper & Martinson, Marc H. Fanning, Fanning Harper & Martinson, P.C., Dallas, for Appellee.

Before Justices O'NEILL, LANG, MAZZANT.

## OPINION

Opinion by Justice LANG.

Appellant Wyndham International Inc. ("Wyndham") appeals the trial court's judgment granting no-evidence motions for summary judgment in its suit brought against ten insurance companies[1] and it's

---

1. Ace American Insurance Co., Caliber One Indemnity Co., Essex Insurance Co., Global

insurance broker, Marsh USA, Inc. ("the Insurance Companies"). In that suit, Wyndham sought damages of over $66 million in business income loss alleged to be the result of the infamous airline hijackings and terrorist attacks on the World Trade Center in New York City and the Pentagon in Washington, D.C., on September 11, 2001. In eight issues, Wyndham claims the trial court erred in excluding its damage expert and then granting the no-evidence motions for summary judgment. We decide against Wyndham on it's issues and affirm the final judgment of the trial court.

## I. Procedural and Factual Background

The losses asserted by Wyndham to be over $66 million were claimed to have resulted from the catastrophic events of September 11, 2001, when four commercial airliners were hijacked by terrorists who flew two of those aircraft into the towers of the World Trade Center in New York City, one into the Pentagon in Washington, D.C., and one into a field outside of Shanksville, Pennsylvania. The World Trade Center was incinerated and collapsed. The Pentagon sustained extensive damage from the impact and attendant fire. Over 3,000 people died as a result of the hijackings and attacks. The United States government issued orders, in the face of the September 11 attacks, which halted all airline service, both commercial and private, for a matter of days. Wyndham asserts these orders, and the significantly increased travel security measures, along with the reaction of the world's population, caused reservations to be cancelled and inhibited the public from using its 163 hotel and resort properties for at least the balance of September and October 2001.

After some discovery and several motions for summary judgment were filed and a few heard, the insurance companies moved to exclude Wyndham's sole damages expert, David A. Borghesi, a C.P.A. and consultant. The Insurance Companies contended that Borghesi's opinions were unreliable and irrelevant, and asked the trial court to exercise its "gatekeeper" function pursuant to TEX.R. EVID. 702. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706 (Tex.1997); *E.I. du Pont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549 (Tex.1995). After extensive briefing and a full evidentiary *Robinson* hearing, the trial court ordered the exclusion of Borghesi's testimony. The order did not specify any grounds for exclusion.

A few days after the order was signed excluding Borghesi, the trial court considered the no-evidence motions for summary judgment. The gravamen of those motions was that there was no evidence to support Wyndham's claim on the policies of insurance, nor was there any evidence of damages, in view of the exclusion of Wyndham's sole damage expert. It is the latter order of the trial court on which the disposition of this appeal turns. Based upon the record, we cannot conclude the trial court abused its discretion in excluding Borghesi's testimony. The final judgment of the trial court is affirmed.

## II. Standards of Review and Applicable Case Law

### a. TEX.R. EVID. 702

 For an expert's opinion to be admissible under rule 702, the expert must

Excess Partners LLC, Certain Underwriters at Lloyd's, London, Royal Surplus Lines Insurance Co., Westchester Fire Insurance Co.,

Westchester Surplus Lines Insurance Co., United States Fire Insurance Co., and Zurich American Insurance Co.

be qualified on the specific issue before the court, and the expert's opinion must be relevant and based on a reliable foundation. TEX.R. EVID. 702; *In re S.E.W.*, 168 S.W.3d 875, 882 (Tex.App.-Dallas 2005, no pet.); *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex.2002); *Gammill*, 972 S.W.2d at 719–20; *Havner*, 953 S.W.2d at 714; *Robinson*, 923 S.W.2d at 556–58. Evidence that is either irrelevant or unreliable is ·inadmissible. *Robinson*, 923 S.W.2d at 557.

■ The relevancy requirement incorporates the traditional analysis of relevance under TEX.R. CIV. EVID. 401 and 402. *Robinson*, 923 S.W.2d at 556. Relevant testimony is that which is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985)). Evidence that has no relationship to the issues of the case, is not of assistance to the jury, and is therefore inadmissible. *Id.*.

■ There are many factors a trial court may consider in determining the reliability of expert testimony. *Id.* at 557. Some of these factors include: (1) the extent to which the expert's opinion has been or can be tested; (2) the extent to which the opinion relies upon the subjective interpretation of the expert; (3) whether the expert's opinion has been subject to peer review or publication; (4) the potential rate of error; (5) whether the expert's opinion was based on a reliable foundation; (6) whether testing was conducted to exclude other possible causes; (7) whether the expert's methodology was suspect; and (8) whether the expert's research was conducted for litigation. *See Neal v. Dow Agrosciences LLC*, 74 S.W.3d 468, 471–72 (Tex.App.-Dallas 2002, no pet.); *Robinson*, 923 S.W.2d at 558–59; *see also Havner*, 953 S.W.2d at 714.

■ The trial court must evaluate the methods, analysis and principles relied upon by the expert in reaching an opinion. *Gammill*, 972 S.W.2d at 725. As the Texas Supreme Court noted in *Havner:*

> If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable. Further, an expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious. Under that circumstance, the expert's ... testimony is unreliable and, legally, no evidence.

953 S.W.2d at 714. Rule 702's fundamental requirements of reliability and relevance are applicable to all expert testimony. *Gammill*, 972 S.W.2d. at 726.

■ We review the trial court's decision to admit or exclude expert testimony for abuse of discretion. *Gammill*, 972 S.W.2d at 728; *Robinson*, 923 S.W.2d at 558. A trial judge abuses her discretion when her decision is arbitrary or unreasonable or she acts without reference to any guiding rules or principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex.2000); *Mercedes–Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex.1996); *Robinson*, 923 S.W.2d at 558.

> The test is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. A reviewing court cannot conclude that a trial court abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court committed a mere error in judgment. The decision whether to admit evidence

rests within the discretion of the trial court.

*Robinson,* 923 S.W.2d at 558 (citations omitted).

### b. Tex.R. Civ. P. 166a(i)

When a motion is presented under rule 166a(i) asserting there is no evidence of one or more essential elements of the non-movant's claims upon which the nonmovant would have the burden of proof at trial, the movant does not bear the burden of establishing each element of its own claim or defense. Tex.R. Civ. P. 166a(i); *Patino v. Complete Tire, Inc.,* 158 S.W.3d 655, 658 (Tex.App.-Dallas 2005, pet. denied); *Gen. Mills Restaurants, Inc. v. Tex. Wings, Inc.,* 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet.); *Lampasas v. Spring Ctr., Inc.,* 988 S.W.2d 428, 432–33(Tex.App.-Houston [14th Dist.] 1999, no pet.). Rather, the burden shifts to the nonmovant to present enough evidence to be entitled to a trial, i.e., evidence that raises a genuine fact issue on the challenged elements. *Id.* If the nonmovant is unable to provide enough evidence, the trial judge must grant the motion. *Id.*

Because a no-evidence summary judgment is essentially a pretrial directed verdict, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750–51 (Tex. 2003), *cert. denied* 541 U.S. 1030, 124 S.Ct. 2097, 158 L.Ed.2d 711 (2004); *Patino,* 158 S.W.3d at 655. We consider all the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Patino,* 158 S.W.3d at 659; *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598 (Tex.2004); *Havner,* 953 S.W.2d at 711. Thus, our task is to determine whether the nonmov-

ant produced any evidence of probative force to raise a fact issue on the material questions presented. *Patino,* 158 S.W.3d at 659; *Gen. Mills,* 12 S.W.3d at 833. A no-evidence summary judgment is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element. *Gen. Mills,* 12 S.W.3d at 833. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner,* 953 S.W.2d at 711.

### III. Discussion and Analysis

■ In their motion to exclude, the Insurance Companies asserted several reasons Borghesi's testimony did not meet the *Robinson* test. We address the following three:

(1) Borghesi bases his entire calculation on a comparison of monthly forecasts of hotel room revenue which are demonstrably unreliable;

(2) Borghesi improperly extrapolates his already unreliable calculation for 101 hotel properties to an additional sixty-two hotel properties; and

(3) Borghesi fails to account for market factors affecting the hospitality industry in September and October 2001, instead concluding that the entire difference between Wyndham's forecast and actual results for a fifty-one day period is attributable to a covered loss.

### a. The Unreliability of Wyndham Forecasts

Borghesi bases his entire opinion on monthly forecasts of room revenues prepared by Wyndham. To arrive at his conclusions, he compared the forecast data to the monthly, actual room revenues. The

insurance companies assert these forecasts are faulty and unreliable. Accordingly, they contend the Borghesi opinion is based upon the unreliable data, is not reliable, nor relevant.

Specifically, the Insurance Companies offered evidence at the *Robinson* hearing of the following: (1) the forecasts were prepared by employees at each of Wyndham's individual hotels, who were not required to follow any type of internal forecasting standards, did not adhere to any economic model, did not have a consistent reference point, and the forecasts were not reviewed by employees with training in forecasting; (2) Borghesi acknowledged that many of the forecasts were not accurate; (3) Wyndham's managers considered the forecasts to be accurate if they were within 5%, plus or minus, of actual revenues; (4) for the month prior to September 11, August 2001, less than 1/3 of the forecasts for the properties met Wyndham's 5% accuracy standard; and (5) Borghesi admitted he made adjustments to the forecasts as he used them in his analysis and the adjustments would yield some erroneous results.

On the other hand, Wyndham asserted: (1) Borghesi was aware of the accuracy standard of 5%, and that many of the August forecasts did not meet that standard, but he allowed for those issues in his calculations; (2) the managers at each property who made the forecasts had extensive experience in preparing such projections, used computer models which took into account economic trends that affect each property, and relied upon the forecasts to run the hotels and track their performance. The record reflects the managers of Wyndham had no "hard and fast rules" for preparation of the forecasts, 5% accuracy tolerance was the rule, and less than 1/3 of the August 2001 forecasts were within Wyndham's 5% accuracy tolerance standard.

### b. The Extrapolation of Revenue Projections for Sixty–Two Properties

Wyndham claims lost business income of over $66 million for 163 of its properties. However, forecasts of revenue were created in the course of Wyndham's business for only 101 of its properties. Borghesi testified he "extrapolated" the projections for sixty-two properties from the forecasts for the 101 properties by separating the sixty-two properties into categories by size and type of service, which Wyndham contends account for the differences between the different types of hotels in Wyndham's portfolio. Wyndham argues the categorization makes Borghesi's analysis "more accurate" by accounting for different types of hotels which would be affected differently by the events of "9–11." Additionally, Wyndham points out that the properties for which projections were extrapolated account for only 13% of the over $66 million projected loss.

The Insurance Companies contend Borghesi's extrapolation is a subjective categorization which fails to address the "myriad factors" which affect the financial experience of each hotel, including geographic location, type, and seasonality. Further, the Insurance Companies argue extrapolations are only permissible if the expert bases the analysis on a "scientifically valid mathematical formula" citing *Heller. v. Shaw Indus., Inc.*, 167 F.3d 146, 162–63 (3rd Cir.1999).

These arguments are not subject to easy resolution. However, the parties acknowledge the extrapolation is based upon the forecasts created by Wyndham for 101 of its individual properties. Any unreliability of those forecasts taints Borghesi's extra-

polated projections, even if it is 13% of the damages. *See Havner,* 953 S.W.2d at 714.

### c. The Failure to Address Other Relevant Evidence

The Insurance Companies contend Borghesi improperly assumed all of Wyndham's revenue downturn was attributable to the events of September 11th. They argue Borghesi made no effort to compensate for any issues or events which occurred subsequent to Sept. 11 which may have affected revenues.

The Insurance Companies offered evidence to the court that Wyndham's own 2001 Annual Report recited that business was affected during the year by the "recent economic downturn" and "decreased consumer confidence." The Insurance Companies also point to a report prepared by Wyndham's accountants which concludes 83% of decreased demand for lodging services was due to "such economic factors." Additionally, the Insurance Companies offered evidence that showed Borghesi did not consider whether events in the post September 11 period were rebooked. They contend the revenue from those bookings was not lost, just "moved" to a later time, pointing to anecdotal evidence in the record reflecting post-September 11 reservations having been moved to times later in 2001. In fact, Wyndham issued a press release dated October 2, 2001, which said, in part, that many of the bookings cancelled for the relevant period had been rebooked for a later time.

In response, Wyndham contends it is impossible to reliably identify, after the fact, specific reasons why people did not travel to Wyndham hotels, i.e., whether it was because of inability to fly, fear of the future terrorism, fear of the impending war in Afghanistan, a sick relative, or a competitor running a promotion. It is asserted by Wyndham that Borghesi fac-

tored in every known variable and must not be required to address the Insurance Companies speculation as to other reasons. Wyndham reasons that Borghesi used their reliable, in-house forecasts, created in accordance with industry standards, to measure the business income loss. Wyndham asserts that every conceivable factor that could affect each hotel's revenues was "baked into" it's forecasts. Additionally, Wyndham claims Borghesi's analysis fully accounts for the declining economic conditions. Finally, as to rebookings, Wyndham contends only that "if a cancelled reservation was rebooked and that guest stayed at any Wyndham hotel during the period of loss, the revenue from the rebooked night would be deducted from the amount of the Wyndham claim."

The record reflects the written report created by Borghesi included this "summary" of his opinion: "In my opinion, the 163 Wyndham owned and managed properties named as covered properties under the policy in effect at the date of loss sustained actual losses from interruption of business as a result of the events of September 11, 2001 in the amount of $66,785,262." Also, the record of the *Robinson* hearing reflects Borghesi's testimony that he was aware of rebooking of cancelled reservations, but did not consider them in his calculations. In his deposition, which is before us in the record, Borghesi stated he did not try to "parse out" or segregate other potential causes for the decline in Wyndham's business such as the recession in the United State's economy in the third and fourth quarter of 2001. He testified that the decline in business activity in those quarters "likely" had an effect on Wyndham's results in those quarters. Later, at the *Robinson* hearing, he testified again about his consideration of other causes subsequent to September 11 that affected the profitability of Wynd-

ham hotels. The following exchange took place:

Q: And if there were any causes subsequent to September 11th which affected the profitability of Wyndham hotels, you have not made any effort to compensate for any such causes, correct?

A: If there were causes that would have been significant.

Q: Well, whether they are significant or not, you have made no effort to compensate for them?

A: That's correct.

### IV. Conclusion

We conclude Borghesi's opinion is not based upon a reliable foundation, and, accordingly, is irrelevant, for a number of reasons. First, the Wyndham forecasts were not reliable. They were not prepared pursuant to any company-wide "hard and fast" rules. Additionally, the August 2001 forecasts, used by Borghesi as his basis for calculating lost income, were significantly flawed. The record reflects that fewer than 1/3 of the August 2001 forecasts for 101 properties were within Wyndham's own liberal, 5% accuracy tolerance standard. Second, the extrapolations of revenue projections for sixty-two properties were drawn from the forecasts for the other 101 properties. Extrapolated projections premised upon unreliable and flawed forecasts merely compounds the unreliability of Borghesi's opinion. Wyndham's explanation that the extrapolated projections only account for 13% of the $66 million damage claim does not cure the unreliability of the damage calculation. Wyndham does not offer the damage calculation in alternative pieces. It urges one measure of $66 million. Finally, Borghesi's failure to compensate for evidence of rebookings, or to compensate for any other causes which could have affected Wyndham's profitability other than the events of September 11, 2001, render his opinion little more than speculation. An expert who is trying to find a cause of something should carefully consider alternative causes. *Robinson*, 923 S.W.2d at 559 (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 758–59 (3d Cir.1994), *cert. denied sub nom.*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995)).

Considering the objections lodged by the Insurance Companies and the evidence in the record, we are unable to conclude the trial judge abused her discretion in granting the motion of the Insurance Companies to exclude Borghesi's testimony. Further, all parties agree Borghesi's testimony was the only damage evidence which Wyndham presented in opposition to the no-evidence motions for summary judgment. Those motions specifically included assertions that Wyndham had no evidence of damages. The exclusion of Borghesi's testimony assured Wyndham had no damage evidence. Accordingly, we conclude Wyndham did not produce any evidence of probative force to raise a fact issue on damages, which is a material question presented. *Patino*, 158 S.W.3d at 659. In view of our conclusions on the foregoing, we need not address the balance of Wyndham's issues. The final judgment of the trial court is affirmed.