In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00091-CV


______________________________




NEAL LAIRD, Appellant



V.



CMI LLOYDS, Appellee




 


On Appeal from the 71st Judicial District Court


Harrison County, Texas


Trial Court No. 06-0251




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Carter



O P I N I O N



 After several water leaks at his home in Marshall, Neal Laird made a claim on his
homeowners policy against his insurance company, CMI Lloyds. CMI paid Laird over $30,000.00
for his loss, but a dispute arose as to the total damages that ultimately resulted in this lawsuit in
which the trial court found by summary judgment that CMI had paid all it owed under the policy. 
Laird, the insured homeowner, appeals the trial court's order granting insurer CMI's motion for
summary judgment and denying Laird's motion for partial summary judgment. 

 Laird asks this Court to reverse the trial court's granting of CMI's motion for summary
judgment; to reverse the trial court's denial of his motion for summary judgment; to render judgment
that the policy affords Laird coverage of the appraisal award elements of UPP manipulation costs
(moving and storage of the house contents) in the amount of $7,239.76, build back estimate costs
(construction costs) of $25,644.43, and mold remediation in the amount of either $9,908.00 or
$5,000.00; and to render judgment in favor of Laird that the policy affords him coverage for loss of
use during the repairs. CMI maintains that it has already paid more than the policy required on this
loss and points out the limitations and exclusions that demonstrate such.

 To resolve the issues on appeal, we must determine if the trial court properly decided that the
summary judgment evidence established, as a matter of law, that CMI had no further financial
obligation under the policy. We must also determine whether Laird brought forth more than a
scintilla of evidence to support his extra-contractual claims.

I. PROCEDURAL AND FACTUAL HISTORY

 A. Background Facts

 On July 10, 2003, and while the homeowners policy was in effect, Laird made a claim with
CMI for an accidental discharge from the plumbing system. CMI assigned three occurrences to the
three separate leaks detected: 1) shower pan leak in hall bath, 2) hot water line leak in hall bath, and
3) drain line leak in utility room. CMI paid Laird $29,725.59 on the loss, and a dispute arose
concerning the amount that CMI should pay Laird.

 Laird and CMI disagreed on the total amount of the loss, prompting Laird to demand an
appraisal pursuant to the policy terms. Under those terms, the parties choose their own appraisers. 
If the two appraisers do not reach an agreement as to the amount of the loss, the two agree as to an
umpire to resolve the issue. H. G. Postert was Laird's appraiser; Allen Neff was CMI's. The two did
not agree as to the amount of loss, but did agree on Ron Rasberry as umpire. Rasberry rendered his
appraisal award December 23, 2004. The appraisal award consisted of the following figures:

Mold remediation $9,908.00

 based on North American Restoration's estimate to comply with ERI's report

UPP manipulation costs $7,239.76

 based on North American Restoration's estimate

Build back costs $25,644.43

 based on Rasberry's own estimate

 Total (replacement) $45,673.51

 Total (actual cash value (ACV)) $42,792.19

After the appraisal, CMI paid an additional $1,019.60. (1) CMI explains that it paid $30,745.19 to
Laird, an amount, CMI claims, more than it should have paid under the policy. CMI has not sought
a refund in this matter.

 B. CMI's Suit and Laird's Counterclaims

 CMI sought a declaratory judgment that it complied with its payment obligations under the
homeowner's policy of insurance. CMI also asked the trial court to adjudicate the liabilities of the
parties with respect to the policy. Laird filed his counterpetition alleging breach of contract,
violations of the Texas Deceptive Trade Practices Act (DTPA), violations of the Texas Insurance
Code, and violations of the duty of good faith and fair dealing. 

 C. CMI's Motion for Summary Judgment

 CMI, as cross-defendant, filed its motion for summary judgment April 24, 2006. In that
motion, CMI took the position that Laird's breach of contract claims should be dismissed because
CMI could prove that it had no further obligation under the policy. CMI also contended Laird's
extra-contractual claims should also fail because Laird could not provide evidence of an essential
element of those claims. CMI supplemented that motion November 22, 2006, and did so again
December 11, 2006. CMI makes clear in its motion and supplements that it moves for a no-evidence
summary judgment as to Laird's extra-contractual claims, citing to Rule 166a(i) of the Texas Rules
of Civil Procedure and identifying the element on which Laird could not produce evidence. 

 D. Laird's Response and His Motion for Partial Summary Judgment

 Laird filed his first amended response March 27, 2007. In his response and in his own
motion, Laird contended that the mold limitation does not apply to build back and manipulation
figures, that the exclusions and limitations of the policy apply in such a way as to obligate CMI to
pay Laird $37,884.19 or $42,792.19, that CMI is responsible for loss of use, that the appraisal award
is binding on CMI, and that the issue of coverage does not protect CMI from extra-contractual
claims. CMI responded to that motion. 

 E. Trial Court's Final Judgment

 The trial court granted CMI's motion for summary judgment and denied Laird's motion for
partial summary judgment. It declared that CMI had no further financial obligation under the policy. 
The trial court's judgment did not specifically address CMI's request to "determine and adjudicate"
the respective liabilities of the parties under the policy. (2) Although the trial court's judgment does
not outline the precise extent of the amount CMI owed under the policy, it did decide that the
summary judgment evidence established that CMI did not owe Laird any more than the $30,745.19
it had already paid. The amount CMI overpaid, if any at all, then was never definitely decided. The
judgment makes clear that it denied CMI's request to make such a declaration. At the outset, we
point out that we, too, decline to make any conclusion as to the precise amount of coverage or any
overpayment by CMI. 

II. APPLICABLE LAW

 A. Preliminary Matter

 The parties agree that, since Laird has not completed the repairs to the house, the appraisal
award figure from which we begin is the ACV figure of $42,792.19 rather than the $45,673.51
replacement cost. 

 B. Effect of the Appraisal Award

 Laird contends that umpire Rasberry's appraisal award is binding and that the policy requires
CMI to pay the entire appraisal amount. To the contrary, the effect of the appraisal is not one that
binds CMI to pay those amounts. See Wells v. Am. States Preferred Ins. Co., 919 S.W.2d 679, 685
(Tex. App.--Dallas 1996, writ denied). Questions of causation and coverage remain. See
Timberlake v. Metro. Lloyds Ins. Co., 230 S.W.3d 798, 800 (Tex. App.--Dallas 2007, no pet.). CMI
did not contest the amount of loss "at the trial court level" and does not do so on appeal; it contests
the cause of certain damages and, thus, the extent to which it is responsible for paying those amounts
under the policy.

 C. Standards of Review

 On issues included in CMI's traditional motion for summary judgment, including policy
provisions and Laird's counterclaim of breach of contract, we will review the summary judgment
de novo and in accordance with the following standards:

 (1) the movant has the burden of showing that there is not an issue of material fact
and that it is entitled to judgment as a matter of law; (2) in deciding whether there is
a disputed material fact issue precluding summary judgment, evidence favorable to
the nonmovant will be taken as true; and (3) every reasonable inference must be
indulged in favor of the nonmovant and any doubts must be resolved in favor of the
nonmovant.


Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005); see also Tex. R. Civ. P.
166a(c); Browning v. Prostok, 165 S.W.3d 336, 344 (Tex. 2005); Timberlake, 230 S.W.3d at 799.

 On appeal, evidence that favors the movant will not be "considered unless it is
uncontroverted." Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41,
47 (Tex. 1965). A trial court should grant a defendant's motion for summary judgment if the
defendant disproves at least one essential element of the plaintiff's cause of action or establishes all
the elements of an affirmative defense as a matter of law. If both parties file a motion for summary
judgment with the trial court, and one is granted and one is denied, the reviewing court should
determine all presented questions and render the judgment that the trial court should have issued. 
Tex. Workers' Comp. Comm'n v. Patient Advocates, 136 S.W.3d 643, 648 (Tex. 2004).

 CMI filed a no-evidence motion for summary judgment as to Laird's counterclaims of
Insurance Code violations and breach of duty of good faith and fair dealing. When the no-evidence
motion for summary judgment is filed, the burden shifts to the nonmovant to present "more than a
scintilla of probative evidence to raise a genuine issue of material fact." Forbes, Inc. v. Granada
Biosciences, Inc., 124 S.W.3d 167, 172 (Tex. 2003). If the nonmovant fails to provide enough
evidence, the trial court must grant the motion. Wyndham Int'l, Inc. v. Ace Am. Ins. Co., 186 S.W.3d
682, 686 (Tex. App.--Dallas 2006, no pet.). A no-evidence summary judgment is essentially a
pretrial directed verdict and the same legal sufficiency standard is applied. King Ranch, Inc. v.
Chapman, 118 S.W.3d 742, 750-51 (Tex. 2003). The trial court should grant a no-evidence
summary judgment when one of the following is present:

 (1) There is a complete absence of evidence of a vital fact; (2) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to prove
an essential element of the nonmoving party's claim or defense; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence
conclusively establishes the opposite of the vital fact.


See Chapman, 118 S.W.3d at 751. We will conclude that there is a genuine issue of material fact
when the nonmovant presents more than a scintilla of evidence establishing the existence of the
challenged element. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). More than a
scintilla of evidence is found when the evidence is enough that would allow "reasonable and fair-minded people to differ in their conclusions." Forbes, Inc., 124 S.W.3d at 172. 

 D. Rules for Interpretation of Policy

 The interpretation of insurance contracts is governed by the same rules of construction
applicable to other contracts. State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995);
Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132 (Tex. 1994). When construing a contract, courts
must strive to give effect to the written expression of the parties' intent. Beaston, 907 S.W.2d at 433. 
To do so, they must read all parts of a contract together. Id. Indeed, courts must be particularly wary
of isolating from its surroundings or considering apart from other provisions a single phrase,
sentence, or section of a contract. Only if an insurance policy remains ambiguous despite these
canons of interpretation should courts construe its language against the insurer in a manner that
favors coverage. Id.; see, e.g., Nat'l Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552,
555 (Tex. 1991); Blaylock v. Am. Guar. Bank Liab. Ins. Co., 632 S.W.2d 719, 721 (Tex. 1982);
Ramsay v. Maryland Am. Gen. Ins. Co., 533 S.W.2d 344, 349 (Tex. 1976).

III. ANALYSIS

 A. Extra-Contractual Issues

 Laird argues that a fact issue exists as to whether CMI had a reasonable basis for denying his
claim, precluding summary judgment on extra-contractual claims. In doing so, it appears Laird treats
this issue under a traditional motion for summary judgment approach. CMI responds that Laird has
ignored the basis on which CMI sought summary judgment. CMI sought a no-evidence summary
judgment pursuant to Rule 166a(i) on the grounds that Laird cannot present evidence to show that
any act of CMI caused him injury independent of the policy claim. CMI points to Provident
American Insurance Co. v. Casteneda, 988 S.W.2d 189, 198-99 (Tex. 1998), to illustrate the
position that Laird had the burden to show that CMI's conduct caused him an injury which was
independent of the policy claims. See also Republic Ins. Co. v. Stoker, 903 S.W.2d 338, 341 (Tex.
1995); United Servs. Auto. Ass'n v. Gordon, 103 S.W.3d 436, 442 (Tex. App.--San Antonio 2002,
no pet.). 

 An insured is not entitled to recover extra-contractual damages unless the complained-of
actions or omissions cause injury independent of the injury resulting from a wrongful denial of
policy benefits. See Castaneda, 988 S.W.2d at 198; Gordon, 103 S.W.3d at 442; see also Parkans
Int'l, LLC v. Zurich Ins. Co., 299 F.3d 514, 519 (5th Cir. 2002). The threshold of bad faith is
reached when a breach of contract is accompanied by an independent tort. Evidence that merely
shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad
faith. Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 18 (Tex. 1994); Nat'l Union Fire Ins. Co. v.
Dominguez, 873 S.W.2d 373, 376-77 (Tex. 1994); Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,
780 S.W.2d 417, 426 (Tex. App.--Texarkana 1989), aff'd, 811 S.W.2d 552 (Tex. 1991).

 Here, diary entries that show that CMI was initially treating this on a per occurrence basis
and providing coverage for two of the three occurrences is the evidence that Laird brings forth that,
he says, shows bad faith on CMI's part. Laird contends that the diary entries show an unreasonable
delay in payment. That may well be, but Laird fails to bring forth evidence of an injury independent
of the unreasonable delay, the element CMI challenged in its no-evidence motion for summary
judgment. Common sense says that the damage to the house probably would have worsened over
time, but we have no evidence to suggest that such damage occurred here. We note that CMI paid
nearly $30,000.00 in the matter before Laird even requested an appraisal. From the dates on the
checks issued, it appears the matter took some time. It also appears that, at some time during the
negotiations and investigation, CMI began treating the matter entirely differently, as a single loss
rather than three separate losses. Nonetheless, Laird points to no evidence relating to an injury
independent of the coverage dispute. The trial court properly granted CMI's no-evidence motion for
summary judgment. 

 B. Extent of Coverage Issues

 1. Figures Established as a Matter of Law

 The summary judgment evidence establishes and the parties agree that certain figures should
be limited or excluded from the appraisal award figure of $42,792.19.

 a. Excess Mold Remediation Costs

 Of the $9,908.00 estimated cost of mold remediation, $4,908.00 is excluded per the mold
remediation limitation clause imposing a maximum coverage of $5,000.00 for mold remediation. 
The mold remediation limitation is clear:

 Section I - EXCLUSIONS, the following exclusions are added:

 . . . .

 6. We do not cover loss consisting of, resulting from, arising out of or in any
way caused by mold, fungus, wet rot, dry rot or other microbes. This
exclusion applies regardless of whether mold, fungus, wet rot, dry rot or other
microbes arise from any other cause of loss, including but not limited to a
loss involving water, water damage or discharge, which may otherwise be
covered by this policy, except provided in Section I - CONDITIONS -
Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of
a Covered Water Loss



 Section I - CONDITIONS

 . . . .

 16. Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of
a Covered Water Loss

 

 In the event of a covered water loss under Section I Property Coverage,
Coverage A (Dwelling) or Coverage B (Personal Property). We will pay up
to $5,000 for mold, fungus, wet rot or dry rot remediation.

 

 Remediation means the reasonable and necessary treatment, removal, or
disposal of mold, fungus, wet rot or dry rot as required to complete repair or
replacement of property we cover under Section I Property Coverage,
Coverage A (Dwelling) or Coverage B (Personal Property) damaged by a
covered water loss, including payment for any loss of fair rental value or
reasonable increase in living expense you incur so that your household can
maintain its normal standard of living if mold, fungus, wet rot or dry rot make
the residence premises wholly or partially untenantable. Remediation also
includes any investigation or testing to detect, measure, or evaluate mold,
fungus, wet rot or dry rot. 

 

 This Condition does not increase the Coverage A (Dwelling) or Coverage B
(Personal Property) limit of liability.


 Laird, while conceding that the limitation would apply, argues that another clause providing
coverage for increased costs of repairing the mold related damage applies to the mold remediation
cost here, making the entire amount covered. He builds his argument on the following provision:

 Section 1 Exclusions. Exclusion 3. "BUILDING LAWS" exclusion is modified to
provide coverage only to the extent described under Perils Insured Against.


 a) Coverage Provided.


 You may use up to $5,000 (at no additional premium) for the increased costs that you
incur due to the enforcement of any ordinance or law, which requires or regulates:


 1) the construction, demolition or repair of that part of a covered building or other
structure damaged by a Peril Insured Against;


 2) the demolition and reconstruction of the undamaged part of a covered building or
other structure, when that building or other structure must be totally demolished
because of damage by a Peril Insured Against to another part of that covered building
or other structure; or


 3) the remodeling, removal or replacement of the portion of the undamaged part of
a covered building or other structure necessary to complete the remodeling, repair or
replacement of that part of the covered building or other structure damaged by a Peril
Insured Against.

 

 You may use all or part of this coverage to pay for the increased costs you incur to
remove debris resulting from the construction, repair or replacement of property as
stated in (a). above.

 

 This is additional insurance and does not reduce Coverage A (Dwelling) the limit of
liability.


Laird asserts that this provision entitles him to additional coverage for mold remediation since the
Texas Occupations Code regulates the mold remediation industry. CMI disagrees with Laird's
reading of the provision. We need not address whether Laird's argument regarding the regulation
of the mold remediation industry would provide coverage under this issue, however, since the policy
itself later limits the coverage in such a way as to exclude the excess mold remediation costs:


 b) Building Ordinance or Law Coverage Limitations

 We will not pay for the increased cost of construction:

 

 1) if the building or structure is not rebuilt or repaired;

 

 2) if the rebuilt or repaired building or structure is not intended for the
same type occupancy as the current building or structure;

 

 3) until the building or structure is actually repaired at the same
premises; or

 

 4) unless the rebuilding or repairs are made as soon as reasonably
possible after the loss or damage, not to exceed 365 days after loss
unless you have requested in writing that this time limit be extended
for an additional 180 days.

 

 c) We do not cover:

 

 1) the loss in value to any covered building or other structure due to the
requirements of any ordinance or law; or

 

 2) the costs to comply with any ordinance or law which requires any
"insured" or others to test for, monitor, clean up, remove, contain,
treat, detoxify or neutralize, or in any way respond to, assess the
effects of, pollutants on any covered building or other structure.


So, despite whether the building laws provision would apply in such a way as to allow coverage for
excess mold remediation in this situation, it appears fairly certain that subsections (b)(4) and (c)
would operate to exclude such additional coverage. Reading the policy as a whole and giving effect
to the mold remediation limitation, we conclude that the excess cost of building does not apply to
the situation here and that the mold remediation coverage is, in fact, limited to $5,000.00. The
excess mold remediation of $4,908.00 should be excluded. 

 b. Fungicide Application Allowance in the Build Back Estimate

 In his build back estimate, Rasberry included an allowance of $2,000.00 specifically for
application of fungicide to "flooring under this dwelling." Laird concedes that this amount, too,
should be excluded as a mold remediation measure in excess of the $5,000.00 limitation.

 c. Foundation Leveling Allowance in the Build Back Estimate

 The evidence establishes, too, that the $3,000.00 allowance included in Rasberry's build back
estimate for leveling of Laird's foundation should not be covered. The policy includes the following
provision relevant to foundation repair:

 SECTION I - EXCLUSIONS, the following exclusions are added:

 . . . .

 7. We do not cover loss under Coverage A (dwelling) consisting of, resulting
from, arising out of or in any way caused by settling, cracking, building,
shrinkage, or expansion of foundation, wall, floors, ceilings, roof structure,
walks, drives, curbs, fences, retaining walls or swimming pools, regardless
of whether such loss ensues from any loss, including a loss involving water
or water damage which is covered under this policy.


According to CMI, this exclusion is commonly referred to as the "settlement exclusion." The build
back estimate clearly designates the $3,000.00 figure to "level foundation" and adds the parenthetical
"(area of leak)." At oral argument, Laird conceded the $3,000.00 allowance falls within the
settlement exclusion. Altogether, the summary judgment establishes, and Laird concedes, that
$9,908.00 should be excluded from the $42,792.19 ACV total. At this point, we are left, then, with
a figure of $32,765.51 with which we must evaluate the remaining figures in light of the summary
judgment evidence. 

 2. Figures on Which Fact Issues Remain

 a. Personal Property Manipulation Costs

 The insurance policy refers to the moving and storage costs of personal property as
manipulation costs. Laird maintains that CMI should be responsible for the entire amount designated
in the appraisal award for personal property manipulation, $7,239.76. CMI responds that it was not
obligated to pay anything toward that figure because that figure, too, is subject to the $5,000.00 mold
limitation. We have looked to the evidence to determine the nature of the property manipulation
costs in order to determine whether those costs were subject to the mold remediation limitation,
whether the summary judgment evidence shows that the property manipulation costs were
"consisting of, resulting from, arising out of or in any way caused by mold, fungus, wet rot, dry rot
or other microbes."

 North American Restoration based its estimate for mold remediation on the findings of ERI
Consultant Engineers and it also provided the personal property manipulation estimate of $7,239.76,
which was adopted by Rasberry in his appraisal award. Keith E. "Eddie" Harmon, a licensed mold
assessment consultant, provided an affidavit and report. From his February 2004 report:

 Extensive visible growth of fungi and water damaged wood was found throughout
the crawl space on the subfloor and joists. [Later in his recommendation:] Repair and
remediation of crawl space joists may require the subfloor to be removed. Should
such action be necessary to facilitate proper repairs then all contents in the home
should be moved to a climate controlled storage facility. Cleaning of contents is not
deemed necessary.


Harmon's affidavit of November 2006 states:

 In addition, as part of the mold remediation, all contents and furniture in the home
are to be moved to an onsite storage area or if such space is not available at the home,
to have the furniture and contents stored at a climate controlled storage facility. This
is necessary so as to prevent the contents and furniture from being contaminated
while mold remediation work is being done, as well as the fact that as the required
mold repairs will include replacement of the subflooring to the home. . . . 


The following evidence comes from umpire Rasberry's deposition:

 Q. . . . . I guess what I'm getting at is, you didn't find any mold-related activities
needed to be conducted on the Lairds' personal property, correct?


 A. Yes.


 Q. In other words, because the subfloor and trades were going to be in and out
of the house, in order to secure their possessions during the construction
project, you wanted to take - someone to take physical possession of the
property, take it offsite for safekeeping and then bring it back after the
construction activities?


 A. Yes, I looked at the hardwood floors, talked to Mrs. Laird about it. I felt like
that the floors had been sanded too many times. This house was built in the
'50s and we couldn't sand the floors again. The hardwood floors would have
to come out. To do that, we needed to remove the furniture. And so that's
the reasons why I allowed it in - in this award.


 Q. Okay. And I guess just what I want to make sure was that I have asked you
is, it was due to construction activities, not mold, that they needed to be
removed?


 A. Yes.

Laird's evidence that the personal property did not have to be cleaned due to contamination does not
necessarily controvert the evidence that the personal property had to be removed from the house due,
at least in part, to the mold remediation that had to be completed on the house. In other words,
evidence that there are other reasons or concerns associated with the decision to remove and store
the personal property does not necessarily controvert the evidence that the removal and storage is
based, in part, on procedures and concerns related to mold remediation.

 Under the doctrine of concurrent causation, when covered and noncovered perils combine
to create a loss, the insured is entitled to recover only that portion of the damage caused solely by
the covered peril. Travelers Indem. Co. v. McKillip, 469 S.W.2d 160, 162 (Tex. 1971); Wallis v.
United Servs. Auto. Ass'n, 2 S.W.3d 300, 302-03 (Tex. App.--San Antonio 1999, pet. denied). The
Texas Supreme Court has continued to uphold this requirement. See Mem'l Hosp., Inc. v. Murdock,
946 S.W.2d 836, 840 (Tex. 1997) (reaffirming holding in McKillip). Under the concurrent causation
doctrine, it is entirely possible that some of the damage could be due solely to a covered peril, and
therefore covered, and some of the damage could be due in part to an excluded peril, and therefore
excluded. 

 Here, the summary judgment evidence does not establish as a matter of law that the personal
property manipulation costs were due to mold remediation such that it would be subject to the
$5,000.00 mold remediation limitation. In fact, neither party's evidence clearly establishes the nature
of the property manipulation costs, leaving a fact issue concerning what amount, if any, would be
covered under the policy. 

 b. Fact Issue Concerning Certain Build Back Repairs Designated as
Mold Related


 There is some evidence showing that the items designated solely as mold-related repairs,
totaling an additional $1,227.95 of the build back estimate, would be subject to the $5,000.00 mold
remediation limitation. For instance, North American Restoration's estimate for mold remediation
includes figures for removal of drywall throughout several rooms of the house. It follows then that
the build back costs associated with replacing and repairing that drywall would stem from mold
remediation and be subject to the mold limitation since that amount would be to "build back" what
was taken out specifically as a means of mold remediation. Harmon's report also concluded that the
mold remediation project would include repair of cracked sheetrock walls and ceilings throughout
the home. 

 However, Rasberry's report describes multiple causes for certain build back repairs and
specifically states that the wall repair and painting are required as a result of floor removal:

 I enclose my dwelling repair estimate for the build back after mold removal. My
figures also include the repairs to the flooring and walls of the dwelling. The wall
repair and painting is a result of floor removal and not foundation settlement. This
dwelling had foundation settlement problems long before the recent plumbing leaks. 
Prior cracks have been repaired and painted over after the foundation repairs were
made many years ago.


 The rotted floor joists and sills under this dwelling is not caused by the recent leaks
involving the hot water line the washing machine drain line leak. It has taken many
years for the wood timbers to rot. The rotted condition of the flooring in the crawl
space of this dwelling is a result of surface water intrusion, HVAC condensate drain
line water, and poor ventilation. The recent plumbing leaks may have been a
contributing factor. Without an engineering study of the foundation of this dwelling,
it is very difficult to separate the damage caused by each influence factor. For this
reason, I have made an allowance of $2,000.00 for brushing and treating the flooring
under this dwelling with a fungicide and I have allowed $3,000.00 for the leveling
of the foundation in the area of the plumbing leak only.


Rasberry's report calls into question the cause of certain build back repairs that Harmon had
designated as mold-related repairs and demonstrates the state of the evidence before us presents an
issue as to whether there are potentially multiple causes of certain damages to the Laird home. 

 Again, for us to affirm the trial court's summary judgment, we must conclude that the
summary judgment evidence establishes as a matter of law that, under no application of the evidence
would CMI owe Laird more than $30,745.19. We cannot so conclude, for the state of the evidence
is such that there are fact issues concerning the causation of certain damages and, when the evidence
is viewed in a certain lens, there are interpretations of the evidence that would suggest that CMI
could owe more money on the loss.

 For instance, viewing the evidence such that Rasberry's report controverts certain figures that
Harmon marked on the build back estimate as related solely to mold, it could be said that CMI owes
Laird $1,369.00. (3)
 Even taking as true and uncontroverted that all the figures Harmon designated
solely as mold-related costs should be excluded, the evidence could be said to indicate that CMI
owes Laird as little as $141.05. (4) 

 The trial court, by rendering summary judgment, concluded that the evidence established as
a matter of law that CMI owed Laird no more than the $30,745.19 CMI has already paid to Laird. 
As discussed, our review of the evidence yields some doubt as to that conclusion. It may, in fact,
be that CMI owes Laird no more, but the summary judgment evidence leaves enough fact issues
unresolved that we cannot say that it establishes that fact as a matter of law. We reverse the trial
court's summary judgment and remand the cause to the trial court for further proceedings.




 Jack Carter

 Justice


Date Submitted: March 19, 2008

Date Decided: June 17, 2008

1. The record shows the following checks were issued, although it appears that Laird never
deposited those checks:


Check Number Amount Date

329547 $2990.90 12/29/03

329548 $4181.17 12/29/03

375292 $6845.85 04/27/04

375250 $7337.67 04/27/04

375252 $3370.00 04/27/04

375293 $5000.00 04/27/04

120679 $1019.60 01/24/05
2. It does not appear that the trial court's failure to do so makes the judgment not final for
purposes of appeal. See In re Burlington Coat Factory, 167 S.W.3d 827, 830 (Tex. 2005).
3. We arrive at this figure by viewing the evidence as follows:


Exclusions established by summary judgment evidence:

Excess mold remediation $4,908.00

Foundation leveling allowance from build back estimate $3,000.00

Brushing/fungicide treatment of (under) flooring from build back $2,000.00


Total allowable exclusions $9,908.00


ACV $42,792.19

Allowable exclusions established by summary judgment evidence -9,908.00

Deductible -770.00

 Amount owed $32,114.19


From that,


Amount owed in this approach $32,114.19

Amount already paid -30,745.19

Amount owed under this scenario $1,369.00

4. Treating the additional $1,227.95 of the build back estimate designated as related only to
mold remediation and repair, the evidence could be said to establish the following figures:


ACV $42,792.19

Excess mold remediation (conceded and established) -4,908.00

Foundation allowance (from build back estimate) -3,000.00

Fungicide Application -2,000.00

Build back cost related only to mold -1,227.95

Deductible -770.00

 Amount owed according to this approach 30,886.24

 Subtracting amount CMI has paid -30,745.19

 Amount owed under this approach to the evidence . . . . . . . . . . . . . . . . . . . . . $ 141.05