**Opinion filed April 15, 2010**



In The

# Eleventh Court of Appeals

_____

### Nos. 11-08-00127-CV & No. 11-08-00171-CV

_____

## DISCOVERY OPERATING, INC., Appellant

## V.

## BP AMERICA PRODUCTION COMPANY, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause Nos. CV44540 & CV46312**

## O P I N I O N

Discovery Operating, Inc. encountered a highly pressurized water flow while drilling an oil well. After investigating the matter, Discovery believed that BP America Production Company's operation of two injection wells caused the water flow. Discovery brought suit against BP to recover damages that allegedly resulted from the water flow. Discovery asserted claims for negligence, negligence per se, and common-law and statutory waste. The trial court granted summary judgment to BP on Discovery's negligence per se claims and severed those claims from the remainder of the

case.[1]  The parties proceeded to a jury trial on Discovery's other claims.  The jury returned a verdict in favor of BP, and the trial court rendered a take-nothing judgment against Discovery.

In Cause No. 11-08-00127-CV, Discovery asserts that the trial court erred in granting summary judgment on its negligence per se claims.  Based on the Texas Supreme Court's recent holding in *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, No. 05-0729, 2009 WL 795760 (Tex. March 27, 2009, reh'g granted), and as explained in this opinion, we conclude that the trial court erred in granting summary judgment to BP on Discovery's negligence per se claims.  Because Discovery's negligence per se claims are inextricably intertwined with its other claims, we conclude that the error in granting summary judgment on the negligence per se claims harmed Discovery in the presentation of its entire case.  Therefore, the error in granting summary judgment in Cause No. 11-08-00127-CV necessitates a reversal and a remand of each of the trial court's judgments in both appellate causes.

In Cause No. 11-08-00171-CV, Discovery complains of four evidentiary rulings.  Discovery asserts that the trial court erred in the following respects:

> (1) in admitting testimony from BP's expert, William D. Griffin, that Discovery encountered a cavern while drilling its well because Griffin's "cavern" testimony was based on speculation and constituted a new opinion that had not been disclosed before trial;

> (2) in admitting testimony from BP's experts, Roy C. Williamson and Dr. William M. Cobb, about injection pressure data relating to Queen injection projects because such testimony amounted to a previously undisclosed expert opinion that the Queen projects caused the water flow that Discovery encountered in drilling its well;

> (3) in excluding testimony from Discovery's expert, Don Sparks, that BP violated the standard of care for operating its injection wells because the issue of whether BP violated the standard of care for operating such wells is not a matter within the knowledge and experience of the average juror; and

> (4) in admitting expert testimony from two Texas Railroad Commission employees, Stephen Christopher Boger and Joe Millhollon, that no correlation

---

[1]BP contends that the trial court granted summary judgment on only one of Discovery's negligence per se claims.  For the reasons stated in this opinion, we conclude that the trial court granted summary judgment on all of Discovery's negligence per se claims.

existed between BP's injection wells and the water flow in Discovery's well because their testimony had not been tested during the *Daubert*[2] proceedings.

For the reasons stated in this opinion, we conclude that the trial court erred (1) in admitting Griffin's "cavern" testimony, (2) in admitting Williamson's and Dr. Cobb's pressure injection data testimony, and (3) in excluding testimony from Don Sparks that BP violated the standard of care for operating its injection wells. We also conclude that the evidentiary errors harmed Discovery and necessitate reversal of the trial court's judgment in Cause No. 11-08-00171-CV.

Therefore, based on the trial court's erroneous summary judgment on Discovery's negligence per se claims, we reverse the judgments of the trial court in Cause No. 11-08-00127-CV and Cause No. 11-08-00171-CV. In addition, based on the trial court's erroneous evidentiary rulings, we reverse the trial court's judgment in Cause No. 11-08-00171-CV. We remand both causes to the trial court for further proceedings consistent with this opinion.

*Introduction*

Discovery encountered a highly pressurized flow of brine water at a depth of about 3,895 feet while drilling its Geronimo 15, No. 6 well.[3] Initially, the water flowed from the well at a rate of about 1,500 to 1,600 barrels per hour, and water continued to flow from the well until Discovery brought the well under control six or seven days later. As a result of the water flow and actions that had to be taken to control the well, Discovery could not complete it.

Because no similar problems had occurred in the area in the past, Discovery concluded that the water flow in the 15-6 well had not been caused by a natural occurrence but, instead, had been caused by man-made subsurface injection. After investigating various injection projects in the area, Discovery concluded that BP's operation of its Sanders A 25 injection well (the 25 well) and its Sweetie Peck 2D injection well (the 2D well) caused the water flow in Discovery's 15-6 well. Therefore, Discovery brought this suit against BP.

Discovery and BP designated experts on the issues of negligence, causation, and damages, and all of these issues were hotly contested. The trial court conducted *Daubert* proceedings to

---

[2]*See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[3]TMBR/Sharp was Discovery's drilling contractor on the well.

determine whether the designated experts were qualified to testify as expert witnesses at trial. During the *Daubert* proceedings, the trial court heard testimony on eight days during a period of about four months. The trial court ruled that all of the witnesses who had testified during the *Daubert* proceedings were qualified to testify as expert witnesses at trial. The jury trial was dominated by detailed, sophisticated, and complex expert testimony. The jury heard testimony on thirteen days.

The case involved the following central issue: What caused the water flow in the 15-6 well? Discovery encountered the water flow in the 15-6 well at a depth of 3,895 feet, which was either at the base of the Seven Rivers formation or at the top of the Queen formation. Initially, Discovery believed that the water flow had been caused by BP's injections into its 25 well and its 2D well. The Texas Railroad Commission had issued permits allowing BP to use these wells as injection wells.[4] With the 25 well, BP injected fluids into the War-San San Andres (WSSA) reservoir, which was part of the San Andres formation, at a depth of about 6,100 feet. With the 2D well, BP injected fluids into the San Andres formation at a depth above the WSSA reservoir.

At trial, Discovery's experts testified that BP's injections into its 25 well caused the water flow in the 15-6 well. Discovery did not offer expert testimony that BP's injections into its 2D well caused the water flow in the 15-6 well, and the trial court granted a verdict in BP's favor on Discovery's claims relating to the 2D well. Thus, the primary disputed causation issue at trial was whether BP's injections into its 25 well at a depth of about 6,100 feet in the WSSA reservoir caused the water flow encountered by Discovery in its 15-6 well at a depth of 3,895 feet in the Seven Rivers formation or the Queen formation. BP's 25 well was about a mile away from Discovery's 15-6 well. BP injected sulfur water into its 25 well, which was much different from the brine water that Discovery encountered in its 15-6 well. However, Discovery's experts contended that pressures and waters injected by BP into its 25 well had escaped the interval allowed by the Railroad Commission permit for the well and had moved pressures and brine water into the area where Discovery encountered the water flow. BP's experts disputed this contention.

---

[4]The permit for the 25 well allowed BP to inject fluids into the San Andres formation at a depth interval from 6,070 feet to 6,170 feet. The permit for the 2D well allowed BP to inject oil and gas waste into the San Andres formation strata at a depth interval from 5,350 feet to 6,000 feet.

4

*Discovery's Petition*

Discovery alleged that, on April 17, 2003, while drilling the 15-6 well, it encountered a strong flow of saltwater at a depth of about 3,895 feet and that the water flow was caused by BP's operations of its 25 well, its 2D well, or both wells. With respect to its negligence cause of action, Discovery alleged that BP owed and breached a duty to it "to exercise reasonable care to prevent its injected fluids from migrating from the approved injection strata, and from entering and/or pressurizing intervals other than those intervals permitted by the Texas Railroad Commission." With respect to its negligence per se cause of action, Discovery alleged that, in operating the injection wells, BP violated the terms of the Railroad Commission permits for the wells, Railroad Commission Statewide Rules 9 and 46, and Sections 86.045 and 91.143 of the Texas Natural Resources Code. *See* 16 TEX. ADMIN. CODE § 3.9 (2004) (Tex. R.R. Comm'n, Disposal Wells), § 3.46 (2004) (Tex. R.R. Comm'n, Fluid Injection Into Productive Reservoirs); TEX. NAT. RES. CODE ANN. § 91.143 (Vernon Supp. 2009). Apparently due to a typographical error, Discovery referred to Section 86.045 of the Natural Resources Code in its petition instead of Section 85.045 or Section 85.046. *See* TEX. NAT. RES. CODE ANN. §§ 85.045, 85.046 (Vernon 2001). There is no Section 86.045 in the Natural Resources Code. The record shows that Discovery was asserting a negligence per se claim for a violation of Section 85.045, which provides that waste is illegal and prohibited, based on the definition of "waste" in Section 85.046. Therefore, we will refer to Section 85.045, Section 85.046, or both sections in our discussion of Discovery's negligence per se claims. With respect to its common-law and statutory waste claims, Discovery alleged that BP's actions in operating "the [i]njection [w]ells in a manner that allowed the injected fluids to escape the permitted intervals" resulted in the "charged interval" that Discovery encountered and, therefore, caused the waste of hydrocarbons that Discovery could have otherwise recovered.

Discovery alleged that it was entitled to recover various elements of damages from BP, including the costs incurred in bringing the 15-6 well under control after the water flow was encountered and costs that would be incurred in the future to plug and abandon the well. Discovery also sought to recover damages "[for the lost] value of the oil and gas that should have been produced from the 15-6 well."

*BP's Plea in Abatement*

BP filed a plea in abatement in the trial court contending that the Railroad Commission had either exclusive or primary jurisdiction over issues relating to whether it had violated Railroad

5

Commission rules, regulations, or permits in operating its injection wells. The trial court agreed with BP's position and entered an order on plea in abatement. In the order, the trial court stated "that exclusive jurisdiction lies with the Railroad Commission to make all preliminary determinations of what, if any, Railroad Commission rules, regulations or permits were violated." The trial court also stated that, if it had erred in concluding that the Railroad Commission had exclusive jurisdiction, then the Railroad Commission had primary jurisdiction to make such determinations. The trial court ordered that the cause be abated "until a ruling or rulings of the Railroad Commission can be had to determine what, if any, violations of the Railroad Commission rules, regulations or permits have occurred."

Discovery filed a petition for writ of mandamus in this court requesting that the order of abatement be vacated and the referral to the Railroad Commission be withdrawn. Relying on TEX. NAT. RES. CODE ANN. §§ 85.321, 85.322 (Vernon 2001), we held that the trial court had committed a clear abuse of discretion in determining that the Railroad Commission had exclusive or primary jurisdiction. *In re Discovery Operating, Inc.*, 216 S.W.3d 898, 905 (Tex. App.—Eastland 2007, orig. proceeding). Therefore, we conditionally granted Discovery's petition for writ of mandamus. *Id.* Later, the trial court entered an order rescinding its order on plea in abatement.

*The Trial Court's Summary Judgment*

BP moved for a no-evidence summary judgment on multiple grounds. BP asserted that it was entitled to summary judgment on Discovery's negligence per se claims because the statutes, rules, and permits relied upon by Discovery in its pleadings did not provide a basis for imposing negligence per se liability. After holding a hearing on BP's motion for summary judgment, the trial court sent a letter to counsel for the parties. The trial court stated the following in the letter:

> In determining whether or not to grant the motion for partial summary judgment regarding negligence per se, *Entex*, 94 SW3d 1,[5] tells me that when civil liability is based on a statute the standard of conduct must be clearly defined in the statute and the injury must grow directly out of a breach of that standard. I am not clear which statute your negligence per se cause of action refers to. There is no 86.045 in the Natural Resources Code. I assume from the other briefing that is a typographical error, but I need to know specifically on what section you intend to rely.

---

[5]*Entex, a Div. of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

6

Discovery responded to the trial court's letter by stating that the reference to Section 86.045 was a typographical error and that the correct statute was Section 85.046.

Later, the trial court entered an order "granting in part and denying in part [BP]'s no-evidence motion for summary judgment." The trial court stated in the order "that [Discovery] has raised more than a scintilla of evidence on all but one point challenged by [BP]'s Motion for Summary Judgment." Following this statement, the trial court discussed *Hicks v. Humble Oil & Refining Co.*, 970 S.W.2d 90, 95 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). The trial court stated that the *Hicks* court held "that negligence per se was not applicable to a violation of Railroad Commission regulation." The trial court explained that the prohibition against waste that was found in the Railroad Commission rule involved in *Hicks* is now found in Section 85.046 of the Natural Resources Code. Based on the reasoning in *Hicks*, the trial court held that a failure to comply with Section 85.046 of the Natural Resources Code does not constitute negligence per se. Therefore, the trial court granted BP's motion for summary judgment with regard to Discovery's negligence per se claim based on alleged violations of Section 85.046. The trial court also severed the claim from the other claims in the cause. The trial court also stated that "[a]ll other claims in [BP]'s Motion for Summary Judgment are denied." Discovery's appeal in Cause No. 11-08-00127-CV arises from the trial court's order granting in part BP's no-evidence motion for summary judgment.

*The Daubert Proceedings*

Discovery presented the following witnesses at the *Daubert* proceedings: (1) Don L. Sparks, a petroleum engineer; (2) Robert C. MacDonald, Ph.D., a petroleum engineer; (3) Coley Ronald Platt, a petroleum engineer; (4) David C. Triana, a petroleum engineer; and (5) Joe C. Neal, a petroleum engineer. BP presented the following witnesses at the *Daubert* proceedings: (1) William D. Griffin, a petroleum engineer; (2) Steven John Seni, Ph.D., a geologist; (3) Roy C. Williamson, a petroleum engineer and a geological engineer; and (4) William M. Cobb, Ph.D., a petroleum engineer.

We have reviewed the *Daubert* testimony in its entirety. While the testimony is helpful to understanding the issues in the case, in the interest of brevity, we will not summarize it here. We will refer to the *Daubert* testimony in this opinion where necessary.

Following the *Daubert* proceedings, the trial court issued a letter ruling. In the letter, the trial court concluded that "all experts offered should be allowed to testify." The trial court found that the experts were qualified to testify and that, with one qualification, their opinions were reliable and

7

relevant. The only qualification was that Griffin in his testimony had characterized several zones as "Yates' et al," and the trial court stated that "[t]he zones he is designating 'Yates' et al' should be called what they are."

*Evidence at the Jury Trial*

Discovery presented twelve witnesses at trial; BP presented nine witnesses at trial. We have reviewed all the trial testimony, and we will now summarize it.

*Discovery's Witnesses.*

Don Sparks testified that BP's 25 well was about a mile away from Discovery's 15-6 well and that, as such, BP and Discovery were offset operators to each other. TMBR/Sharp was the drilling company for Discovery on the 15-6 well. Don Sparks said that the drilling company prepares drilling records that are kept on the rig until it is completed; these records are called "tour sheets." Don Sparks also said that the drilling company sends daily reports to the operator. During his testimony, Don Sparks discussed the April 17, 2003 tour sheet for the 15-6 well. The tour sheet showed that the water flow was encountered at 5:15 p.m. at 3,895 feet and that, at that time, a pressure of 900 psi was measured on the standpipe. Don Sparks said that Discovery hit the water flow at the base of the Seven Rivers formation or the top of the Queen formation. He said that the 900-pound pressure that was measured on the standpipe was not measuring the pressure coming from the bottom of the hole up or a flowing or shut-in pressure. He also said that, to measure a true bottom-hole pressure, you must have a closed system in which the blowout preventers are shut in. Don Sparks testified that the first shut-in pressure measured after Discovery encountered the water flow was 550 pounds and that this pressure number would be used to compute the bottom-hole pressure.

Based on a lack of any similar problems in the past, Don Sparks concluded that the water flow in the 15-6 well had not been caused by Mother Nature. Instead, he believed that it had been caused by some type of man-made injection. Don Sparks concluded that the pressures and waters that Discovery encountered in the 15-6 well had been caused by BP's 25 well (primary source) and BP's 2D well (possibly a secondary source) injection sources. Don Sparks testified that water that had been injected from the source of the pressure – BP's injection wells – had moved into another area, pressured water that was already in the other area, and caused that water to move to the area where Discovery encountered it.

8

Don Sparks testified that the industry standard for the operation of injection wells is to maintain operations in such a manner so as to prevent anything that would cause damage to any offset operators. Based on his review of BP's files, Don Sparks testified that water injected by BP had escaped the approved interval. He referred to such water as "out of zone." Don Sparks also said that BP had record-keeping problems. Based on BP's objection, the trial court ruled that Don Sparks could not testify on the issue of whether BP violated the industry standard for operating injection wells.[6]

Don Sparks testified that he was not aware of any major problems in the Yates formation in Midland County. However, he was aware that problems had occurred in the Yates formation in other counties. He testified that those problems were nothing like what Discovery encountered in the 15-6 well. Don Sparks also testified that Discovery had never sustained a water flow coming from a blowout in the Yates formation. He said that, normally, high nitrogen comes out of a well when a Yates blow occurs and that a Yates blow is generally a short-lived problem. He also said that Discovery had drilled through the Yates formation when it encountered the water flow in the 15-6 well.

Earl Michie, a petroleum engineer, testified that his company, Terrace Petroleum, drilled the Terrace Peck 21-3 well. Michie testified that drilling operations commenced on the 21-3 well on March 27, 2005. Michie said that, during drilling, at a depth of about 3,850 feet, Terrace Petroleum encountered a significant water flow. He said that, to obtain a shut-in pressure on a well, the well has to be physically shut in. Michie testified that, after Terrace Petroleum shut in the 21-3 well, the standpipe on the well measured 625 pounds shut-in pressure. Michie testified that, before drilling the 21-3 well, he had never encountered such a water flow in the area. Michie said that the water flow encountered in the 21-3 well had no similarities to a Yates air blow. He said that he had never encountered a Yates blow in the area where the 21-3 well was drilled. He also said that a Yates blow is gaseous in nature and does not have a liquid flow.

Dr. MacDonald testified that he investigated the waterflood projects that were located within about a five-mile radius of the 15-6 well. As part of his investigation, he studied the War-San project, which contained BP's 25 well. He also studied ten other waterflood projects that were

[6]We note that the trial court also ruled that Don Sparks, who had been designated as an expert in petroleum engineering and drilling and completing wells, could not testify about geology issues because he had not been designated as an expert in geology. This ruling is confusing. As a petroleum engineer, Don Sparks had obtained expertise in petroleum geology in the Midland County area. Therefore, the record appears to demonstrate that the designation of Don Sparks as a petroleum engineer included his expertise in petroleum geology.

located in four reservoirs, including the Pegasus San Andres reservoir, the Moose Queen reservoir, the Concho Bluff Queen reservoir, and the Concho Bluff North Queen reservoir. Dr. MacDonald testified that he compared the amount of water that had been injected into the project areas with the amount of oil and water that had been produced from those areas. Dr. MacDonald testified that, the higher the injection-to-production ratio, the more likelihood that water is out of zone. Dr. MacDonald prepared a graph showing the injection-to-production ratios (cumulative injection in barrels of water divided by the cumulative production of barrels of oil plus water) for the projects. He testified that, with respect to projects other than the War-San project, the injection-to-production ratios remained relatively constant from 1975 forward. Considering that (1) the injection-to-production ratio of the War-San project was 3.5 to 1, (2) the injection-to-production ratios of the other projects, the maximum of which was 1.7 to 1, had remained constant for a number of years, and (3) the other projects were somewhat distant from the 15-6 well, Dr. MacDonald testified that he had eliminated the other projects as possible candidates for the water flow encountered by Discovery in the 15-6 well.

Dr. MacDonald also testified that he conducted a material balance study of the WSSA reservoir. Dr. MacDonald's calculations indicated that the reservoir contained 140 million barrels of pore volume, which he said was the available volume in which liquids and gases could reside. Dr. MacDonald characterized the WSSA reservoir as a "pot" or a contained reservoir. He said that one would expect a reservoir's pressure to increase as injection occurs but that the pressure will not increase if the reservoir leaks. Based on his study, Dr. MacDonald testified that pressure had leaked from the WSSA reservoir into the Queen formation. Dr. MacDonald said that the total injection into the WSSA reservoir had been about 16 million barrels, that total production from the reservoir had been about 5 million barrels, and that, therefore, about 11 million more barrels had been injected than had been produced. In Dr. MacDonald's opinion, the WSSA reservoir could not contain the amount of fluids that had been injected into it. Dr. MacDonald testified that the WSSA reservoir reached an injection-to-production ratio of about 1 to 1 in January 1989 and, later, became significantly over-injected. He said that the WSSA reservoir "pressured up at one time in the nineties and leaked" and "[t]hat's what caused the pressure in the other zones." Dr. MacDonald testified that, in his opinion, the water injection into the 25 well was the source of the water flow in the 15-6 well.

10

Platt testified that the WSSA reservoir was a distinct reservoir within the San Andres formation. Platt said that, in investigating the water flow in the 15-6 well, he conducted research on forty-six wells that were drilled in the area before 1960. He said that these wells had been drilled before water injection was taking place in the area. Based on his investigation, Platt concluded that the pressurized water encountered by Discovery below the 15-6 well was not the result of a natural occurrence. He based his conclusion on the following: (1) the wells drilled in the area before water was injected had not encountered water flow problems and (2) his experience in the area.

Platt testified that Discovery studied water injection projects other than the War-San project in an attempt to eliminate them as potential sources of the water flow in the 15-6 well both (1) by the distance that they were away from the 15-6 well and (2) by a study of their injection-to-production ratios. Platt explained that, the farther away an injection project was from the 15-6 well, the less likely that project was the source of the problem in the 15-6 well. He testified that, in his opinion, the other projects, which were four to five miles away from the 15-6 well, were not the source of the pressure increase in the 3,900-foot zone that resulted in the water flow in the 15-6 well. Platt concluded that Discovery had eliminated the other injection projects as sources of the water flow in the 15-6 well.

Platt testified that, in his opinion, pathways existed for pressure communication between BP's 25 well and Discovery's 15-6 well. He prepared a schematic drawing demonstrating potential pathways that involved the 25 well, the 9 well, the 26 well, and the 15-6 well. A copy of the drawing, which was entitled "Pathways for Pressure Communication Between Sanders A-25 and Water Flow Encountered in Geronimo 15-6 Well" was introduced into evidence. Platt testified that the injection pressures used by BP in the 25 well were high enough to cause the pressures encountered by Discovery in the 3,900-foot zone below the 15-6 well. He said that, in his opinion, the over-injection of water into the WSSA reservoir by the 25 well caused the water flow in the 15-6 well. He also said that the 900 psi measured on the standpipe during the water flow was not the shut-in pressure on the 15-6 well.

Jeff Sparks, who is a petroleum engineer with Discovery, testified that he prepared drilling prognoses for the wells that Discovery drilled on the Geronimo lease. Before Discovery drilled its wells on the Geronimo lease, Jeff Sparks conducted a records search relating to wells that had been drilled in the area. He testified that his search showed that there had never been any water flow

problems in the area. He also testified that Discovery had never encountered a problem in the Yates formation in Midland County.

Neal testified that Don Sparks requested him to perform a peer review of the depositions of the expert witnesses in the case and to prepare an engineering evaluation of what would have been recovered from the 15-6 well had it been completed as a producing well. Neal testified that Discovery's experts did not use any unusual procedures or practices to develop their conclusions and that they used standard and reliable procedures in performing their engineering evaluations. He also testified that he prepared a reserve study for the 15-6 well. Neal concluded that the well would have produced about 90,000 barrels of oil and 198,000 mcf of gas and that Discovery's net revenue from the well would have been $2,865,495, or $1,748,514 if discounted at a 10% rate.

*BP's Witnesses*.

Steven Lee Rowell was a toolpusher for TMBR/Sharp, the drilling company for Discovery on the 15-6 well, when the water flow was encountered on the well. Rowell testified that he was in the toolpusher's trailer house when the water flow was encountered. He said that he went to the rig floor after being informed of the water flow. He testified that he read a pressure of 900 psi on the standpipe after the mud pumps had been "kicked out." Rowell wrote "[w]ell flowing with 900 psi" on the tour sheet. Rowell testified that, normally, when the mud pumps are kicked out, the standpipe pressure will go to zero. He said that the pressure was not coming from the pump and that, therefore, it would have been coming from downhole. He also said that, when the well was flowing, the blowout preventers were open.

Rowell also testified that brine water was flowing from the well. He said that he had never seen anything like the water flow in the 15-6 well in Midland County. Rowell testified that he had experienced Yates air problems in the past. He said that the water flow in the 15-6 well did not resemble in any way what he had experienced with Yates air blows.

Anthony Ray Aguilar, a BP employee, testified that the water BP injected into the 25 well was really black and stunk really bad. He said that he took a daily reading on the amount of water injected and that he wrote down this information. He testified that he never saw a shut-in pressure on the 25 well that was as high as 900 pounds.

Stephen Christopher Boger was an employee of the Railroad Commission. BP presented his testimony by deposition. Boger had a degree in geological sciences. He testified that, based on his experience, it was not possible that 650 pounds of pressure at BP's injection well could have caused

900 pounds of pressure in Discovery's 15-6 well a mile away. Boger believed that there was no correlation between BP's injection wells and the water flow in Discovery's 15-6 well. Boger also testified that Joe Millhollon, another Railroad Commission employee, saw no relationship between BP's injection wells and Discovery's 15-6 well. BP also presented Millhollon's testimony by deposition. Millhollon concluded that, based on his review of well-monitoring charts, no relationship or correlation existed between BP's injection wells and Discovery's 15-6 well.

Griffin testified about the April 17, 2003 tour sheet for the 15-6 well. The tour sheet indicated that, between 4:30 p.m. and 5:15 p.m., Discovery drilled from 3,878 feet to 3,895 feet and that, at 3,895 feet, Discovery hit a brine flow. Griffin testified that, from 5:15 p.m. to 7:30 p.m., the well was flowing with 900 pounds of pressure on the standpipe. The following exchange took place during additional questioning by BP's counsel about entries on the tour sheet:

> [BP'S COUNSEL]: All right. And then at 7:30, what did they do, that evening?
>
> [GRIFFIN]: At 7:30, they started drilling again. As you can see, [the tour sheet] says, "Drilling with flow from 3,913 feet to 3,988 feet."
>
> [BP'S COUNSEL]: All right. Now, Mr. Griffin, there is a difference between where they stopped drilling at 3,895 and where they started drilling at 3,913, of some 18 feet.
>
> [GRIFFIN]: That's correct. You can see this is where they stopped drilling at 3,895 feet, and then the next – when they started drilling again was 18 feet deeper at 3,913 feet.
>
> [BP'S COUNSEL]: And what does that indicate?
>
> [GRIFFIN]: That indicates they didn't need to drill. They hit a cavern or extremely soft formation or something like that down there, more likely a cavern.
>
> [DISCOVERY'S COUNSEL]: Your Honor, please, I object to Mr. Griffin speculating about what that means. It is not on the [tour sheet]. Nobody else has testified who was on the well. And that's pure speculation.
>
> [THE COURT]: Just a minute. I'll overrule the objection and let you question him about it on cross.
>
> [BP'S COUNSEL]: So that there is an area there that's about 18-foot thick, Mr. Griffin, that is either real high porosity or it's a cavern or something that they didn't have to drill through?

[GRIFFIN]: Something awful soft or a cavern that just the weight of the bit just dropped through it.

[BP'S Counsel]: And if it was, in fact, a cavern there, would that sort of support the 1,500 barrels per hour of flow that was reported coming out of this well?

[DISCOVERY'S COUNSEL]: If your Honor please, that is pure speculation. Again, he is not going to base an opinion upon speculation as to what – there has been no predicate laid that they didn't record – why did they not record the 18 feet?

There is nothing in here about a cavern. There is nothing in here about lost circulation. It doesn't say lost circulation. Most of the drilling reports, when they lose circulation, will say that.

I renew the objection. I don't think he is entitled to offer an opinion about that.

[THE COURT]: I'll overrule the objection.

[BP'S COUNSEL]: Now, if I understand, we are not talking about lost circulation. We are talking about a flow coming into the well at this interval, aren't we, Mr. Griffin?

[GRIFFIN]: That's correct. [Discovery's counsel] is correct. I don't see any indication of lost circulation up there at all. I just see that they didn't have to drill and the bit dropped 18 feet when they went back in the well.

Griffin also testified that the presence of a cavern under the 15-6 well would account for a very rapid evacuation of fluids from that zone. During cross-examination, Griffin acknowledged that the tour sheet did not state that the "bit dropped," but he said, "[T]hat's what happened." Griffin also said that, if inconsistencies existed between the tour sheet and the morning report, he would trust the tour sheet because it was filled out as drilling occurred.

Griffin also testified that, in his opinion, the water flow in the 15-6 well was caused by a Yates air blow. He said that the Yates air blow was caused by a partial collapse of the supporting matrix at 3,900 feet. Griffin explained the concept of "overburden rock." He said that, if you are at a depth of 3,900 feet, "overburden rock is everything above [that depth], and whatever it weighs." He also said that, when gypsum converts to anhydrite, a 39% reduction in rock volume has occurred. Griffin testified that, when the collapse of the overburden is more severe, water flows and blowouts similar to what happened in the 15-6 well will occur. In Griffin's opinion, compressed nitrogen drove the water out of the 15-6 well. He said that the gas that was associated with the water flow

14

in the 15-6 well "was almost all nitrogen." He said that the water flow in the 15-6 well was similar to what had happened during Yates air flows in Wasson Field wells in Yoakum County.

Griffin also testified about Discovery's potential pathways for water and pressure to migrate from BP's 25 well to Discovery's 15-6 well. He said that, with respect to the 26 well, if water entered the wellbore at a depth of 6,100 feet, it could not go up to the 3,900-foot level because the 26 well had a cement plug in it from 5,825 feet to 6,000 feet and another cement plug in it at around 5,200 feet. He said that Discovery's pathway assumed that the cement plugs in the well did not exist. Griffin also said that other wells contained plugs and, therefore, could not be pathways from the 6,100-foot interval to the 3,900-foot interval. In Griffin's opinion, no single wellbore could have acted as a pathway for migration of water or pressure from the 6,100-foot interval to the 3,900-foot interval.

In Griffin's opinion, injection into BP's 25 well did not cause the water flow in Discovery's 15-6 well because the pressure in the 25 well was lower than the pressure in the 15-6 well. Griffin said that, had the 25 well been connected to the 15-6 well at the time of the water flow, the measured shut-in pressure in the 15-6 well would have been the same as the shut-in pressure in the 25 well (260 pounds). Griffin's theory of a lack of communication between the two wells was based on an application of Pascal's law.

Williamson testified about Discovery's potential pathways for migration of fluids and pressures from BP's 25 well to Discovery's 15-6 well. In Williamson's opinion, fluids could not have moved in any of the wellbores around the 25 well and the 15-6 well from the 6,100-foot level to the 3,900-foot level. He said that adequate pipe and cement existed in the wellbores to prevent such migration. Williamson testified that Discovery contended, if the cement plugs in the 26 well had not held, the 26 well by itself would have served as a conduit or a pathway from the 6,100-foot level to the 3,900-foot level. Williamson said, however, that there was no evidence that the plugs had not held.

Williamson performed a study to ascertain whether or not there was an area of porous interval in the San Andres formation around BP's 25 well and Discovery's 15-6 well. Based on his study, Williamson determined that the San Andres formation contained 10.179 billion barrels of porous rock. Williamson testified that he later corrected his calculations to account for the possible existence of shale in the formation. He said that taking into account the possibility that shale existed in the formation reduced his calculation as to storage capacity in the San Andres formation from

15

10.179 billion barrels to 6.126 billion barrels. Thus, in Williamson's opinion, the San Andres formation contained a very large area of storage capacity and was large enough to contain the water that had been injected into it.

BP's counsel asked Williamson whether he prepared a factual study of the surrounding Queen injection projects that Dr. MacDonald had excluded as possible causes of the water flow in the 15-6 well. Over Discovery's objections, the trial court permitted Williamson to testify about his study of the Queen projects. Williamson testified that he prepared graphs summarizing information that he obtained from Railroad Commission H-10 forms relating to the surrounding injection projects. BP introduced the graphs into evidence. In the graphs, Williamson showed the amount of water that had been injected in the projects and the pressures that had been used to inject the water. Williamson testified about the average surface injection pressures shown on the graphs. In summary, Williamson's testimony showed that the average surface injection pressures in the Queen projects were much higher (such as 2,000 psi and 2,500 psi) than the injection pressures in BP's 25 well.

Williamson also testified that he performed a reserve study and a cash analysis for the 15-6 well. He projected a net revenue for the well in the amount of $578,111, which discounted at the rate of 10% equaled $134,092.

Dr. Seni testified that BP's 25 well was permitted under Rule 46 as an injection well. He said that BP's injection took place in the War-San Field and that the approved strata for injection was the entire San Andres formation. Dr. Seni said that the permit for the 25 well did not require the injected water to be confined to a strata at the depth interval from 6,070 to 6,170 feet. He said that the depth interval from 6,070 to 6,170 feet was simply where injection was required to take place. Dr. Seni testified that, in his opinion, there was no evidence indicating that fluids injected by BP had escaped the approved strata.

Dr. Seni also testified that a main characteristic of a confined reservoir is the presence of high pressures. He said that a confined reservoir is not surrounded by and attached to a larger water aquifer and, therefore, has a potential water drive. Dr. Seni said that the WSSA reservoir had hydrostatic or lower than hydrostatic normal pressures and only a slight water drive, which were not characteristics of a confined reservoir.

Dr. Cobb testified that Pascal's law is as follows: "In a closed system, a pressure change produced at one point in the system will be transmitted throughout the entire system." Based on an application of Pascal's law, Dr. Cobb concluded that BP's 25 well and Discovery's 15-6 well were

16

not in communication. He said that the shut-in pressure on the 25 well was 260 psi and that the injected water weighed 9 pounds per gallon. Dr. Cobb testified that Discovery indicated that the water flow in the 15-6 well consisted of 10-pound brine water. Dr. Cobb performed an analysis using a 260 psi shut-in pressure at the 25 well and a 550 psi shut-in pressure at the 15-6 well. He testified that, under these conditions, communication between the wells could not exist because the pressures were not the same and that, if the wells were somehow connected, water should be moving from the 15-6 well toward the 26 well and then toward the 25 well. Dr. Cobb also performed an analysis using an injection pressure of 520 pounds at the 25 well and a flowing pressure at the surface of the 15-6 well of 900 pounds. Based on his analysis, he testified that he did not believe that the wells could have been in communication and that, if the wells were in communication, the water should have been moving from the 15-6 well toward the 25 well. Based on his studies, Dr. Cobb did not believe that BP's injection into the 25 well caused the water flow that Discovery encountered in the 15-6 well because the pressures in the wells "[did not] match."

Dr. Cobb testified that, in an ideal world, Pascal's law requires that everything be static in a system. In this case, he assumed that the pressures were in static communication with each other. He said that, when things are dynamic, Pascal's law provides a very good estimate for what the end result would be in a static condition. He also said that this case did not involve "a perfectly static system."

Dr. Cobb testified that he analyzed Dr. MacDonald's material balance study of the WSSA reservoir. Dr. Cobb said that Dr. MacDonald assumed that the water in the aquifer and the oil in the oil reservoir reacted instantaneously and that, therefore, if the pressure changed in the oil reservoir, an instantaneous pressure change would occur in the aquifer in the same amount. In Dr. Cobb's opinion, based on the conditions in the War-San San Andres Field, Dr. MacDonald's assumption was invalid. Dr. Cobb explained that instantaneous transmission of pressure is a reasonable assumption only if the dimension of the aquifer is of the same order of magnitude as the dimension of the reservoir and that, in this case, the oil reservoir and the aquifer were not of the same order of magnitude.

Dr. Cobb testified that he performed work concerning the surrounding Queen floods. Over Discovery's objections, the trial court permitted Dr. Cobb to testify about injection pressures that had been used in the surrounding Queen floods. Dr. Cobb testified that he summarized Railroad Commission production and injection data by fields. He testified that, between July 1999 and July

17

2004, the Jennifer Queen Unit Number 8 injected at a surface injection pressure, on average, of 2,200 psi. Dr. Cobb's testimony showed that other wells in the Queen floods injected at similar pressures. By way of comparison, Dr. Cobb said that the surface injection pressure in BP's 25 well during the same period of time ranged from about 900 to 950 psi. Dr. Cobb converted the surface shut-in pressures for the Queen projects to bottom-hole pressures. He then calculated pressure gradients for the projects by taking the bottom-hole pressures and dividing those pressures by the depths of the projects. Dr. Cobb testified that the pressure gradient for the Concho Bluff Queen project was 1.01 psi per foot, that the pressure gradient for the Concho Bluff North Queen project was 1 psi per foot, and that the pressure gradient for the Moose Queen project was 0.96 psi per foot. By way of comparison, Dr. Cobb said that the pressure gradient for the War-San project was 0.604 psi per foot. Dr. Cobb testified that, in his experience, "when the pressure gradient exceeds about .7 to .75, you are very near, if not perhaps above, the fractured pressure of the reservoir." He said that injecting at a pressure above the fracture pressure creates cracks in the rock and allows the water to move in paths that were previously not available. However, Dr. Cobb testified that he had no evidence that the operators of the Queen projects had fractured the formations into which they were injecting.

Dave McKenna testified as the corporate representative for BP. McKenna testified that, on September 10, 2003, he had a meeting with Don Sparks, Kevin Sparks, and Jeff Sparks about Discovery's 15-6 well. McKenna said that, after the meeting, Berry Simpson, who was a contract production engineer for BP, concluded that BP's injection wells did not cause the problem in Discovery's 15-6 well. McKenna testified that most of the water that was injected into the 25 well was from the Ellenburger formation. He said that Ellenburger water was sour and black and smelled strongly of H2S. McKenna had heard that clear brine water had flowed out of Discovery's 15-6 well.

*Discovery's Rebuttal Witnesses.*

Platt testified about the pressure data that he used in concluding that pressure communication existed between the 25 well and the 15-6 well. He said that Dr. Cobb had criticized the pressures he used in making his calculations. Platt testified that he used a 940 psi injection pressure for the 25 well. He said that BP had reported the 940 psi pressure in a Railroad Commission H-10 form and that the H-10 form corresponded with pressure information in BP's records. Platt said that he converted the 940 psi injection pressure to a shut-in pressure of 590 psi. Platt testified that, "[u]sing the 590, it shows pressure communication from the 25 to the 15-6."

Platt also testified that he and Dr. MacDonald looked at all the data, including surface injection pressures, relating to the Queen projects, when they concluded that the Queen projects could be eliminated as a cause of the water flow in the 15-6 well. Platt said that he and Dr. MacDonald had no reason to believe that the operators of the Queen projects had fracked the formation or that the Queen projects had water out of zone.

Don Sparks testified that the 900 psi measurement on the 15-6 well's standpipe gauge was not an appropriate number by which to calculate a flowing bottom-hole pressure. He said that, to obtain a shut-in drillpipe pressure, the blowout preventers must be closed. Don Sparks said that, when the 900 psi was measured on the standpipe gauge, the blowout preventers were open. He said that, unless there is a problem, the standpipe gauge measures the pressure that is going down the hole. Don Sparks testified that, after the system was shut in, the 15-6 well had shut-in pressures ranging from 400 psi to 550 psi.

Don Sparks also testified about Griffin's "cavern" testimony. He said that the tour sheets are kept by the drilling company until the job is finished. He also said that the drilling company provides Discovery with a morning report each day during drilling. Don Sparks testified that the April 18, 2003 morning report did not indicate that there was an 18-foot gap in drilling the 15-6 well. He said that, instead, the morning report showed that, from 7:30 p.m. to 9:00 p.m., TMBR/Sharp "drilled with flow from 3,895 to 3,988." He also said that nothing on the morning report indicated that the drill bit fell or that a cavern was encountered. Don Sparks testified that he had never seen a drill bit drop eighteen feet and that, if a drill bit fell that far, it would shake the whole location.

*The Verdict and Judgment*

The trial court granted a directed verdict to BP on Discovery's claims relating to BP's 2D well. The trial court submitted a broad-form negligence question to the jury:

QUESTION NO. 1:

> Did the negligence, if any, of B.P. America Production Company, in its operations of the Sanders A-25 saltwater injection well proximately cause the uncontrolled water flow in the Discovery Operating, Inc. Geronimo 15-6 well?

In a ten-to-two verdict, the jury answered "no" to Question No. 1. The jury did not answer Question No. 2, the damages issue, because it was conditioned on a "yes" answer to Question No. 1. Based on the jury's verdict, the trial court entered a take-nothing judgment against Discovery.

19

Discovery filed a motion for new trial that was based, in part, on the admission of Griffin's "cavern" testimony. Discovery filed an affidavit from Rowell, the toolpusher on the 15-6 well, in support of the motion. Rowell stated the following in his affidavit: that the water flow was encountered at 3,895 feet; that, at 7:30 p.m., they resumed drilling with the flow at 3,895 feet as the morning report indicated; that no soft spot or cavern was encountered in the drilling of the well; that the drill bit did not drop eighteen feet; that the unexpected water flow and resulting confusion apparently resulted in the error (failure to log eighteen feet of drilling) in the IADC Report (tour sheet); that, in preparing the morning report, he noted the discrepancy and made the necessary correction; and that the morning report was accurate.

Discovery's motion for new trial was overruled by operation of law, and Discovery filed its appeal in Cause No. 11-08-00171-CV. In its appeal, Discovery contends that the trial court committed four errors in making evidentiary rulings and that the errors require a reversal of the judgment and a remand of the case for a new trial.

*Discovery's Negligence Per Se Claims – Cause No. 11-08-00127-CV*

Discovery's negligence per se claims were based on BP's alleged violations of two statutes (Sections 85.045 and 91.143 of the Natural Resources Code), two Railroad Commission Statewide Rules (Rules 9 and 46), and the Railroad Commission permits for the 2D and 25 wells. Section 85.045 prohibits waste in the production, storage, or transportation of oil and gas. Section 91.143 prohibits filing false applications, reports, and documents with the Railroad Commission and tampering with gauges. Rule 9 applies to operations of disposal wells. Rule 46 applies to operations involving fluid injection into productive reservoirs. Discovery alleged that BP's violations of these statutes, rules, and permits constituted negligence per se.

BP filed a no-evidence and supplemental no-evidence motion for summary judgment based on a number of grounds. In one ground, BP asserted that there was no evidence that it had committed conduct constituting negligence per se. In its order, the trial court found "that [Discovery] has raised more than a scintilla of evidence on all but one point challenged by [BP]'s Motion for Summary Judgment." The "one point" referred to in the trial court's order related to BP's challenge to Discovery's negligence per se claims. Although the trial court found that a lack of evidence existed on "one point," the trial court decided the issue on a point of law. Specifically, the trial court, relying on *Hicks*, held that a failure to comply with Section 85.046 of the Natural Resources Code does not constitute negligence per se.

20

*Review of Summary Judgment*

In its sole issue on appeal in Cause No. 11-08-00127-CV, Discovery asserts that the trial court erred in granting summary judgment on its negligence per se claims. BP asserts that the trial court's order granting summary judgment was limited to Discovery's claim under Section 85.046 and did not grant summary judgment to it on Discovery's other negligence per se claims. We disagree with BP for two reasons. First, the trial court, in granting summary judgment, relied on *Hicks* for the proposition "that negligence per se was not applicable to a violation of [a] Railroad Commission regulation." Thus, the trial court's reasoning for granting summary judgment applied equally to all of Discovery's negligence per se claims. Second, the record in Cause No. 11-08-00171-CV shows that the trial court and the parties understood that the order granting summary judgment disposed of all Discovery's negligence per se claims. During the jury trial, one of BP's lawyers made the following statement at the bench: "I thought that we had been very careful that we weren't going to talk about rule compliance or rule noncompliance, because negligence per se is not in this case." Similarly, counsel for Discovery and BP both made statements during a hearing on motions in limine that "negligence per se is out of the case." We conclude that the trial court's order granted summary judgment to BP on all of Discovery's negligence per se claims.

When the trial court ruled on BP's motion for summary judgment, it did so without the benefit of the Texas Supreme Court's recent opinion in *Emerald*. The Texas Supreme Court issued its opinion in *Emerald* after the parties filed their appellate briefs in these appeals. In that case, Emerald, the current mineral lessee, encountered unexpected problems when it attempted to reenter wells that had been plugged and abandoned by Exxon, the former mineral lessee. 2009 WL 795760, at *1. Emerald sued Exxon, alleging that Exxon had caused the problems by improperly plugging and intentionally sabotaging the wells. Emerald alleged the following claims, among others, against Exxon: (1) that Exxon violated a statutory duty under TEX. NAT. RES. CODE ANN. § 89.011 (Vernon Supp. 2009) to plug a well properly; (2) that Exxon violated a statutory duty under Section 85.045 of the Natural Resources Code to not commit waste; and (3) that Exxon engaged in conduct constituting negligence per se. Emerald asserted that Exxon violated Section 89.011 of the Natural Resources Code by violating Railroad Commission Statewide Rule 14 regulating plugging of wells. *Id.* at *1; *see* 16 TEX. ADMIN. CODE § 3.14 (2007) (Tex. R.R. Comm'n, Plugging).

In *Emerald*, the Texas Supreme Court first addressed whether Section 85.321 of the Natural Resources Code created a private cause of action for the claims asserted by Emerald. Section 85.321 provides, in part, as follows:

> A party who owns an interest in property or production that may be damaged by another party violating the provisions of this chapter that were formerly a part of Chapter 26, Acts of the 42nd Legislature, 1st Called Session, 1931, as amended, or another law of this state prohibiting waste or a valid rule or order of the commission may sue for and recover damages and have any other relief to which he may be entitled at law or in equity.

The Texas Supreme Court held that the clear language of Section 85.321 creates a private cause of action for damages resulting from violations of (1) provisions of Chapter 85,[7] (2) other laws of this state prohibiting waste, and (3) valid rules and orders of the Railroad Commission. The court explained that, while the first two categories refer to claims for waste, the third category is not so limited. Thus, a violation of any Railroad Commission rule or order triggers the third category of actions. 2009 WL 795760, at *4.

After concluding that Section 85.321 creates a private cause of action, the Texas Supreme Court then addressed whether Emerald's status as a subsequent mineral lessee impacted its standing to bring a cause of action under Section 85.321. The court explained that, in Section 85.321, the legislature had provided a private cause of action to a person who "owns an interest . . . that may be damaged by another party violating the provisions of this chapter." *Id.* Based on this language and applying the common-law principle that a purchaser of real property cannot recover for an injury to the property that occurred before he acquired his interest, the court concluded that Emerald lacked standing to bring a cause of action under Section 85.321 because it did not own an interest in the mineral leases when Exxon allegedly damaged the interest. *Id.* at *5. The court briefly addressed Emerald's negligence per se claim. The court concluded that, "[b]ecause our holding that a subsequent lessee has no standing to bring a claim under section 85.321 stems from common law principles, Emerald lacks standing to bring a negligence per se claim for the same reasons." *Id.* at *6.

*Emerald* stands for two propositions: (1) that Section 85.321 creates a private cause of action; and (2) that the private cause of action does not extend to subsequent lessees. The Texas Supreme Court has granted Emerald's motion for rehearing relating to the second proposition. The

---

[7]TEX. NAT. RES. CODE ANN. ch. 85 (Vernon 2001 & Supp. 2009).

second proposition does not apply to Discovery's claims because it is not a subsequent lessee. Instead, Discovery owned the mineral interests when the alleged injury occurred. Based on the Texas Supreme Court's holding in *Emerald*, Discovery has the right under Section 85.321 to assert its negligence per se claims against BP, whether the claims are labeled as a private cause of action for violations of statutes and Railroad Commission rules and orders or as negligence per se claims for violations of the same statutes, rules, and orders.

The trial court erred in granting summary judgment to BP on Discovery's negligence per se claims. On remand, Discovery will be able to plead its claims in accordance with the Texas Supreme Court's opinion in *Emerald*.

BP contends that Discovery waived its complaint that the trial court erred in granting summary judgment because Discovery failed to plead a cause of action under Section 85.321 or to raise Section 85.321 in its response to BP's motion for summary judgment. Texas follows a "fair notice" standard for pleading in which courts assess the sufficiency of pleadings by determining whether an opposing party can ascertain from the pleading the nature, basic issues, and the type of evidence that might be relevant to the controversy. *Low v. Henry*, 221 S.W.3d 609, 612 (Tex. 2007); *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases its claim. The purpose of this rule is to give the opposing party sufficient information to enable it to prepare a defense. *Horizon/CMS Healthcare*, 34 S.W.3d at 897; *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982).

Discovery did not specifically refer to Section 85.321 in its petition or in its response to BP's motion for summary judgment. However, Discovery alleged in its petition that it owned the mineral leasehold. Discovery also identified the specific statutes and rules that it contended BP had violated. Discovery also alleged that it had been damaged as a result of BP's violations. The facts alleged by Discovery were sufficient to give BP fair and adequate notice of a claim under Section 85.321. *See Zavala v. Trujillo*, 883 S.W.2d 242, 249 (Tex. App.—El Paso 1994, writ denied) (Although the appellant did not specifically plead a violation of a statute, his allegations were sufficient to impart fair notice to the appellee that he intended to rely on the statute to impose liability.); *Ransopher v. Deer Trails, Ltd.*, 647 S.W.2d 106, 110 (Tex. App.—Houston [1st Dist.] 1983, no writ) (Although the appellee's pleadings lacked a specific statutory reference, they were sufficient because they provided fair notice of the issues to be tried.). In addition, Discovery presented summary judgment evidence in support of its claims that BP had violated the statutes, Railroad Commission rules, and

the permits for the 2D and 25 wells. We also note that Section 85.321 was central to the outcome of the earlier mandamus proceeding in this court. *See In re Discovery Operating*, 216 S.W.3d at 902-05. Discovery met the fair-notice pleading requirement. Therefore, Discovery did not waive its complaint that the trial court erred in granting summary judgment.

BP contends that the trial court properly exercised its discretion in concluding that a violation of Section 85.046 does not constitute negligence per se because (1) Section 85.046 fails to set forth specific standards of conduct necessary for the imposition of negligence per se liability and (2) it is not penal in nature. For these same reasons, BP also contends that Section 85.321 will not support a negligence per se claim. Therefore, BP argues that the trial court did not err in granting summary judgment.

BP relies on *Perry v. S.N.*, 973 S.W.2d 301, 304 (Tex. 1998), to support the proposition that determining whether a particular statute will support a negligence per se claim is a matter within the discretion of the court. Negligence per se is a common-law doctrine that allows courts to rely on a penal statute to define a reasonably prudent person's standard of care. *Reeder v. Daniel*, 61 S.W.3d 359, 361-62 (Tex. 2001). The mere fact that the legislature adopts a criminal statute does not mean that the courts must accept it as a standard for civil liability. *Perry*, 973 S.W.2d at 304. In *Perry*, the court explained that the adoption of criminal statutes into tort law is a matter of judicial discretion. *Id.* The threshold questions in every negligence per se case involving a penal statute are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Id.* at 305. If a plaintiff satisfies these threshold questions, the court must determine whether it is appropriate to impose negligence per se liability for violations of the statute. In *Perry*, the Texas Supreme Court identified five nonexclusive factors to consider in determining whether a statute establishes an appropriate standard for negligence per se liability: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common-law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of wrongdoers; and (5) whether the plaintiff's injury is due to a direct or indirect violation of the statute. *Id.* at 309.

24

BP has correctly identified the *Perry* factors in its brief. However, this case does not involve the issue of whether it would be proper to impose negligence per se liability for the violation of a general penal statute. Rather, this case involves a private cause of action that has been created by the legislature. By enacting Section 85.321, the legislature created a cause of action in favor of a party who owns an interest in property or production that may be damaged by another party's violations of (1) the provisions of Chapter 85, (2) another Texas law prohibiting waste, or (3) a valid rule or order of the Railroad Commission. *Emerald*, 2009 WL 795760, at *4. In light of the Texas Supreme Court's holding in *Emerald* and the clear language of Section 85.321, we need not analyze Sections 85.045 and 85.321 under the *Perry* factors. Section 85.045 was involved in the *Emerald* case, and the Texas Supreme Court recognized that a private cause of action exists for a violation of that statute. In Section 85.321, the legislature clearly established the conduct required for imposing liability: a violation of a provision of Chapter 85, another Texas law prohibiting waste, or a valid rule or order of the Railroad Commission. *Emerald*, 2009 WL 795760, at *4. Thus, based on Section 85.321, liability may be imposed for such violations, and the legislature left no discretion to the courts to determine otherwise.

BP also contends that the issues presented by Discovery in its appeal from the summary judgment are moot. BP's contention is based on the jury's verdict in Cause No. 11-08-00171-CV. One of the elements of a negligence per se claim is that the defendant's act or omission proximately caused the plaintiff's injury. *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). BP asserts that, in Cause No. 11-08-00171-CV, the jury found that BP's operations were not a proximate cause of the water flow in Discovery's 15-6 well. BP argues that this finding negates the proximate cause element of Discovery's negligence per se claims and, therefore, renders moot the issues presented by Discovery in its appeal from the summary judgment.

In Cause No. 11-08-00171-CV, the trial court submitted a broad-form negligence question to the jury:

> Did the negligence, if any, of B.P. America Production Company, in its operations of the Sanders A-25 saltwater injection well proximately cause the uncontrolled water flow in the Discovery Operating, Inc. Geronimo 15-6 well?

The jury answered "no" to the question. Based on the broad-form submission of the question, we cannot determine from the jury's "no" answer whether the jury believed that BP was not negligent or that BP's negligence was not a proximate cause of the water flow. *See McRae v. Echols*, 8

25

S.W.3d 797, 801 (Tex. App.—Waco 2000, pet. denied) ("The broad-form submission makes it impossible for a reviewing court to ascertain whether the jury felt that Echols was not negligent or that his negligence was not a proximate cause of the accident."); *Carr v. Jaffe Aircraft Corp.*, 884 S.W.2d 797, 802 (Tex. App.—San Antonio 1994, no writ) ("The jury's negative answer [to a broad-form negligence question] may have been based on a failure to find either negligence or proximate cause."). Therefore, the jury's "no" answer cannot be used to establish a finding on proximate cause, and BP's assertion that the jury made such a finding is incorrect. The issues presented by Discovery in its appeal from the summary judgment are not moot.

BP argues that, if the trial court erred in granting summary judgment, the error was harmless. A trial court's erroneous decision to grant summary judgment can be rendered harmless by subsequent events in the trial court. *Progressive County Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005). For example, a subsequent jury finding that negates an essential element of the claim upon which the trial court erroneously granted summary judgment renders the error harmless. *Id.* at 921-22. In *Progressive*, the court concluded that the jury's finding on a breach of contract claim that no coverage existed under the insurance policy negated recovery on the plaintiff's extra-contractual claims; therefore, if the trial court had erred in granting summary judgment on the extra-contractual claims, the error was harmless. *Id.*

BP's argument is based on its contention that the trial court granted summary judgment only on Discovery's negligence per se claim for violations of Section 85.046 of the Natural Resources Code. Discovery alleged claims for negligence per se and for statutory waste based on Section 85.046. BP asserts that Discovery's negligence per se claim under Section 85.046 was cumulative of its statutory waste claim under that statute and that, because the trial court did not grant summary judgment on the statutory waste claim, any error in granting summary judgment on the negligence per se claim was harmless. BP contends that Discovery waived its common-law and statutory waste claims by failing to request the trial court to submit them to the jury.

We concluded above that the trial court erroneously granted summary judgment to BP on all of Discovery's negligence per se claims. Subsequent events in the trial court did not render the summary judgment harmless. The trial court severed the negligence per se claims from the other claims in the case. During the jury trial, both BP and Discovery recognized that "negligence per se [was] out of the case." The trial court's summary judgment prevented Discovery from developing its negligence per se claims and submitting them to the jury. Even if BP is correct in its assertion

26

that Discovery's negligence per se claim based on the definition of "waste" in Section 85.046 was cumulative of its statutory waste claim, Discovery's negligence per se claims for violations of Section 91.143, Rules 9 and 46, and the injection permits were not cumulative of other claims. The jury's verdict did not negate recovery by Discovery on its negligence per se claims. The trial court's error in granting summary judgment was not harmless. We sustain Discovery's issue in Cause No. 11-08-00127-CV. Therefore, the trial court's order granting summary judgment must be reversed, and Discovery's negligence per se claims must be remanded for a new trial.

*Effect of Summary Judgment Ruling on Remainder of the Case*

We next consider whether the trial court's erroneous decision to grant summary judgment requires reversal of the judgment in Cause No. 11-08-00171-CV. An error is harmful if it "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1); *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 211 (Tex. 2009) (orig. proceeding); *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009). We review the entire record to determine whether an error has resulted in harm. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

As a result of the trial court's summary judgment ruling, "negligence per se [was] out of the case." As such, Discovery was denied the opportunity to prove that BP violated Railroad Commission rules or the terms of the permits for its injection wells. The summary judgment limited Discovery's presentation of its case and prevented it from receiving a fair trial. Instead of being able to proceed on its negligence per se claims, Discovery was forced to present its case in a piecemeal fashion. The parties hotly contested the issues of negligence and causation. During jury deliberations, the jury sent the trial court a note stating, "Judge, we are split on our vote." After receiving instructions from the trial court, the jury resumed deliberations and ultimately returned a nonunanimous, ten-to-two answer to the combined negligence and causation question in BP's favor. While there is no way to know how the jury would have answered a question submitting Discovery's negligence per se claims, the jury might have answered the negligence question in Discovery's favor had the trial court given it the opportunity to consider the negligence per se claims. Based on our review of the entire record, we conclude that the trial court's erroneous summary judgment and the resulting failure to submit Discovery's negligence per se claims to the jury probably caused the rendition of an improper judgment in Cause No. 11-08-00171-CV. Therefore, the error in granting summary judgment was harmful.

We have concluded that the trial court's error in granting summary judgment harmed Discovery in Cause No. 11-08-00127-CV and in Cause No. 11-08-00171-CV. Therefore, we will reverse the trial court's judgments in both causes and remand the causes for new trial. We will next address the issues raised in Cause No. 11-08-00171-CV.

*Evidentiary Issues in Cause No. 11-08-00171-CV*

Discovery contends that the trial court made four erroneous evidentiary rulings during the jury trial. Specifically, Discovery argues that the trial court erred (1) in admitting Griffin's "cavern" testimony; (2) in admitting injection pressure data relating to the Queen injection projects through the testimony of BP's experts, Williamson and Dr. Cobb; (3) in excluding expert testimony from Don Sparks that BP violated the standard of care relating to the operation of its injection wells; and (4) in admitting expert testimony from Railroad Commission employees, Boger and Millhollon.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Interstate Northborough P'ship*, 66 S.W.3d at 220; *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

An expert's opinion, to be admissible, must be relevant and reliable. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002). To be relevant, the expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology. *Cent. Expressway*, 302 S.W.3d at 870; *Zwahr*, 88 S.W.3d at 629. Expert testimony is unreliable if it is no more than "subjective belief or unsupported speculation." *Zwahr*, 88 S.W.3d at 629; *City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 510 (Tex. App.—Eastland 2007, pet. denied).

*Griffin's "Cavern" Testimony.*

Griffin did not testify about his "cavern" theory during the *Daubert* proceedings. Instead, he disclosed it for the first time at trial. We have quoted Griffin's "cavern" testimony above. Discovery argues that Griffin's "cavern" testimony was inadmissible because it was "no more than mere speculation and subjective belief." Griffin testified that the tour sheet indicated that Discovery stopped drilling at 3,895 feet and, later, resumed drilling at 3,913 feet. Griffin's "cavern" testimony was based on this 18-foot gap in the tour sheet. In response to a question by BP's counsel, Griffin testified that the 18-foot gap "indicate[d] that they didn't need to drill" and that "[t]hey hit a cavern

28

or extremely soft formation or something like that down there, more likely a cavern." Discovery objected to this testimony on the ground that it was "pure speculation." The trial court overruled the objection, and Griffin provided additional "cavern" testimony that is set forth above, speculating that the pressurized water came from the cavern.

Griffin's "cavern" testimony was based solely on his interpretation of the 18-foot gap in the tour sheet. Rowell was the toolpusher for TMBR/Sharp, and he was present when the water flow was encountered in the 15-6 well. Although BP called Rowell as its first witness at trial, BP's counsel did not ask Rowell about the 18-foot gap in the tour sheet or whether Discovery had hit a cavern or soft formation during drilling.[8] No witness testified to any facts that would support the conclusion that Discovery encountered a cavern or soft spot while drilling. Because Griffin's "cavern" testimony was not supported by facts in evidence, the testimony was no more than Griffin's "subjective belief or unsupported speculation." Therefore, Griffin's ipse dixit "cavern" testimony was unreliable and inadmissible. *Zwahr*, 88 S.W.3d at 629; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727-28 (Tex. 1998).

BP argues that Discovery waived its "speculation" objection to Griffin's "cavern" testimony by allowing him to provide additional "cavern" testimony without objection. As shown above, after the trial court overruled Discovery's "speculation" objection to Griffin's initial "cavern" testimony, BP's counsel essentially summarized the "cavern" testimony in his next question to Griffin, and Griffin provided additional "cavern" testimony in response to the question. Discovery did not object to this question or answer. However, Discovery renewed its "speculation" objection in response to the next question asked by BP's counsel, and the trial court again overruled the objection. Thus, although Discovery did not object to one question and answer, Discovery immediately renewed its objection in response to the next question. Later, Griffin again restated his "cavern" theory, without objection, that, "when they went through that 18-foot level, it was at least [an] extremely soft formation, if it existed at all, as compared to what they were drilling immediately above." At this point, the trial court had already overruled two "speculation" objections to Griffin's "cavern" testimony, and the trial court undoubtedly would have overruled another such objection. Under these circumstances, we conclude that Discovery did not waive its "speculation" objection to Griffin's

[8]Although not necessary to our decision, we note that Rowell stated in his post-trial affidavit that no soft spot or cavern had been encountered during the drilling of the well and that the drill bit had not dropped eighteen feet during drilling.

29

"cavern" testimony. *See Atkinson Gas. Co. v. Albrecht*, 878 S.W.2d 236, 242 (Tex. App.—Corpus Christi 1994, writ denied) ("[W]hen a party makes a proper objection to the introduction of certain testimony by a witness and is overruled, he is entitled to assume that the judge will make the same ruling as to other offers of similar evidence, and he is not required to repeat the objection.").

BP also argues that Discovery waived its objections to Griffin's "cavern" testimony because, during cross-examination, Discovery asked him "to repeat in large part" his "cavern" testimony. However, "[i]t is well settled that cross-examination of a witness as to testimony improperly admitted over objection does not waive the right to complain of the error." *Chandler v. Welborn*, 294 S.W.2d 801, 810 (Tex. 1956).

Griffin's "cavern" testimony was based on unsupported speculation. Therefore, the testimony was unreliable, and the trial court abused its discretion in admitting it.[9]

*Injection Pressure Data from Queen Projects.*

During the jury trial, BP's counsel asked Williamson whether he had prepared a factual study of the Queen injection units. Discovery's counsel objected to this question on the ground that Williamson had not expressed any opinion on the Queen projects during the *Daubert* proceedings. BP's counsel responded that Williamson was not going to express an expert opinion but was going to present "factual data" on the surrounding floods. BP's counsel stated that the "factual data" refuted Dr. MacDonald's opinion that the Queen projects were not the cause of the water flow in the 15-6 well. The trial court ruled that Williamson could testify to facts but that he could not testify to expert opinions that were not tested during the *Daubert* proceedings. Williamson then testified that he had prepared graphs summarizing information contained in H-10 injection sheets that were on file with the Railroad Commission. The graphs showed the volumes of injection and the surface injection pressures used in the Queen projects. Williamson testified about the surface injection pressures shown in the graphs. Williamson's testimony showed that the surface injection pressures in the Queen projects, such as 2,000 psi and 2,500 psi, were much higher than the injection pressures in BP's 25 well.

---

[9]Discovery also argues that Griffin's "cavern" testimony was inadmissible because it was a "new" opinion that had not been properly disclosed during the *Daubert* proceedings. Based on our ruling that the trial court should have excluded the "cavern" testimony because of its speculative nature, we need not address Discovery's argument that the testimony was inadmissible because it constituted a "new" opinion or BP's argument that Discovery waived its "new" opinion complaint by failing to object on that ground at trial.

BP's counsel also asked Dr. Cobb about work he had performed in studying the Queen projects. Discovery's counsel objected to the question on the ground that Dr. Cobb had not testified to any opinion about the Queen floods during the *Daubert* proceedings. BP's counsel responded that Dr. Cobb would be testifying about factual evidence that was relevant to whether or not Discovery had adequately excluded the surrounding floods as a cause of the water flow in the 15-6 well. In arguing that BP should be allowed to question Dr. Cobb about the injection pressure data, BP's counsel stated that "[i]t is up to the Plaintiffs to rule out reasonable alternatives" and that "we are going to show to the jury this data, and they can draw the conclusions they want to." The trial court indicated that Dr. Cobb could testify about facts but not give any opinions about the Queen floods. Dr. Cobb then testified about the average surface injection pressures for the Queen projects as shown on the graphs that Williamson had prepared. Dr. Cobb's testimony showed that the average surface injection pressures for the Queen projects, such as 2,000 psi and 2,200 psi, were much higher than the average surface injection pressure of about 900 psi to 950 psi for BP's 25 well. Dr. Cobb also testified that he had calculated the pressure gradients for the Queen projects. According to Dr. Cobb's testimony, the pressure gradients for three of the Queen projects exceeded the fracture pressure of the reservoirs. Dr. Cobb testified that injecting at a pressure above the fracture pressure creates cracks in the rock and allows the water to move in paths that were previously not available.

Discovery contends that Williamson's and Dr. Cobb's "factual" testimony about injection pressures in the Queen projects amounted to a previously undisclosed causation opinion: "[T]hat the Queen waterfloods were the cause of the loss of the Discovery well." Discovery asserts that this causation opinion was speculative and unreliable because it was solely based upon surface injection pressures. Therefore, Discovery argues that the opinion was inadmissible. BP responds that Williamson and Dr. Cobb merely presented factual summaries of the data on which Dr. MacDonald and Platt had relied in excluding the Queen projects as causes of the water flow in the 15-6 well. BP states that "[t]he summaries were relevant to Dr. MacDonald's and Platt's opinion that the Queen Water Floods could be eliminated as a potential source and cause of the problems with the Geronimo 15-6." BP contends that the summaries "showed that Discovery had not truly ruled out the Queen Water Floods."

The injection pressures in the Queen projects may have been relevant to Dr. MacDonald's and Platt's opinions that the Queen projects could be eliminated as the cause of the water flow in the

31

15-6 well. However, BP did not cross-examine Dr. MacDonald or Platt about the injection pressures. Instead, BP asked its own experts about the injection pressures without tying the testimony to any specific expert opinion. As stated by BP's counsel, BP intended to allow the jury to draw its own conclusions from the pressure injection data. While neither Williamson nor Dr. Cobb testified to a specific opinion that the Queen injection projects caused or could have caused the water flow in the 15-6 well, their testimony about surface injection pressures certainly suggested such an opinion to the jury. Thus, the manner in which BP presented the testimony about injection pressures was tantamount to providing a previously undisclosed expert opinion. In the absence of proper expert opinion testimony from Williamson and Dr. Cobb that tied the injection pressure data from the Queen projects to the issue of whether they could be eliminated as a cause of the water flow in the 15-6 well, the jury was left to speculate and could not make an informed decision on the issue. We conclude that the trial court erred in admitting the injection pressure data through the testimony of Williamson and Dr. Cobb.

*Exclusion of Testimony that BP Violated the Standard of Care.*

The trial court allowed Don Sparks to testify that an industry standard of care applies to the operation of injection wells and to describe the standard. However, the trial court did not allow him to testify that BP violated that standard. With respect to the issue of whether or not BP violated the industry standard of care, the trial court stated, "I think that's a question for the jury." Based on this reasoning, the trial court apparently concluded that expert testimony was not proper on the issue of whether BP violated the standard of care. Thus, the trial court ruled that Don Sparks could "testify to facts" but could not "opine" on whether or not BP violated the industry standard of care. The trial court also sustained BP's objections to such opinion testimony by Don Sparks on the grounds of relevance and speculation. During a bill of exception, Don Sparks testified that he did not believe that BP met the industry standard. He said that BP violated the standard by failing to perform reservoir work to determine whether injected water was staying in zone.

Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of a layman. *Roark*, 633 S.W.2d at 809; *Parker v. Three Rivers Flying Serv., Inc.*, 220 S.W.3d 160 169 (Tex. App.—Eastland 2007, no pet.); *Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 738 (Tex. App.—Amarillo 1999, pet. denied). In such a case, the expert testimony must establish both the standard of care and the violation of that standard. *Simmons v. Briggs Equip.*

*Trust*, 221 S.W.3d 109, 114 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Parker*, 220 S.W.3d at 169; *Dardis*, 1 S.W.3d at 738; *Hager v. Romines*, 913 S.W.2d 733, 734-35 (Tex. App.—Fort Worth 1995, no writ). The operation of injection wells is not within the experience of a layman. As such, Discovery was required to present expert testimony on the standard of care for the operation of injection wells and that BP's conduct did not meet that standard. *Dardis*, 1 S.W.3d at 738.

Don Sparks had reviewed BP's records relating to its operation of the 2D and 25 injection wells and the Railroad Commission's records relating to those wells. The record demonstrates that Don Sparks had studied in detail the history of BP's operation of its injection wells and that he was familiar with BP's operation of those wells. Based on his knowledge of the industry standard of care and of BP's operation of its injection wells, Don Sparks's opinion that BP had violated the standard of care was not based on speculation. His opinion testimony was also relevant to the issue of whether BP violated the standard of care. In fact, Discovery was required to present such expert testimony on the issue. *Simmons*, 221 S.W.3d at 114; *Dardis*, 1 S.W.3d at 738; *Hager*, 913 S.W.2d at 734-35. Therefore, we conclude that the trial court erred in excluding testimony from Don Sparks that BP violated the standard of care for operating its injection wells.

*Expert Testimony by Railroad Commission Employees*.

Based on our rulings on Discovery's first three issues and our finding below that those rulings caused harm to Discovery, we need not address Discovery's fourth issue that the trial court erred in admitting expert testimony from Boger and Millhollon. TEX. R. APP. P. 47.1.

*Harm Caused By Evidentiary Errors*

Erroneous admission or exclusion of evidence requires reversal if the error probably caused the rendition of an improper judgment. *Cent. Expressway*, 302 S.W.3d at 870; *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). The Texas Supreme Court has recognized the impossibility of prescribing a specific test to determine whether a particular error is harmful and entrusts that determination to the sound discretion of the reviewing court. *Cent. Expressway*, 302 S.W.3d at 870. In conducting a harm analysis, we review the entire record. *Cent. Expressway*, 302 S.W.3d at 870; *Nissan*, 145 S.W.3d at 144; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted. *Interstate Northborough P'ship*, 66 S.W.3d at 220; *Able*, 35 S.W.3d at 617; *Alvarado*, 897

33

S.W.2d at 753-54. Exclusion or admission of evidence is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Cent. Expressway*, 302 S.W.3d at 870; *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). But if erroneously admitted or excluded evidence was crucial to a key issue, the error is likely harmful. *Cent. Expressway*, 302 S.W.3d at 870; *Reliance Steel*, 267 S.W.3d at 873. In determining whether the erroneous admission of evidence is harmful, we may consider efforts made by counsel to emphasize the evidence. *See Nissan*, 145 S.W.3d at 144.

Causation of the water flow in Discovery's 15-6 well was a key issue at trial. During the *Daubert* proceedings and at trial, Griffin testified that, in his opinion, a Yates air blow caused the water flow in the 15-6 well. Discovery countered this opinion with evidence that it was not drilling in the Yates formation when it encountered the water flow, that the water flow did not have the characteristics of a Yates air blow, and that Yates air blows had not occurred in the area where it drilled the 15-6 well. Griffin presented his "cavern" theory for the first time at trial. He testified that Discovery hit a "cavern or extremely soft formation" while drilling the 15-6 well and that "a cavern underneath the 15-6 well, that would account for a very rapid evacuation of fluids from that zone."

Through Griffin's trial testimony, Discovery faced the previously undisclosed opinion that drilling into a cavern caused the high-pressure water flow in the 15-6 well. Griffin's "cavern" testimony was not cumulative of other evidence in the trial. No other witness testified that a cavern or soft formation was present under the 15-6 well. In a case in which causation was a hotly contested issue and in which much of the competing causation evidence was sophisticated and complex, Griffin's speculative "cavern" theory provided the jury with a relatively simple and straightforward explanation for the water flow in the 15-6 well: that Discovery hit a cavern that was full of water. As the only evidence that a cavern existed under the 15-6 well, Griffin's testimony was crucial to a determination of the causation issue.

Statements made by BP's counsel during closing argument emphasized Griffin's "cavern" testimony to the jury:

> Mr. Griffin testified about the 18-foot break – drilling break, bit drop, call it whatever you want to. But there's 18 feet there, according to the IADC report, which he says, in his opinion, is the most reliable of the documents, because it is done simultaneously with what's going on that drilling rig.
>
> He says, "What does that indicate to me?"

He says, "They hit a cavern or extremely soft formation or something like that down there, more like a cavern."

Well, if you think about it a minute, flowing 18 – or 15,000 barrels of – 1,500 barrels of fluid out of that wellbore per hour, has got to take something other than the cement in your garage floor as the vehicle for carrying that fluid. It's got to be like a cavern, or it has got to be like a very, very porous sponge, because, remember, that's what Dr. MacDonald said. It's like your garage floor. It's cement.

So it's not something water moves through easily. And 1,500 barrels an hour is an extreme amount of water.

These statements by BP's counsel underscored the crucial nature of Griffin's "cavern" testimony to the determination of the causation issue.

Likewise, the testimony from Williamson and Dr. Cobb about the injection pressures that were used in the Queen projects amounted to a new causation opinion. Their testimony encouraged the jury to conclude that the Queen projects caused the water flow in Discovery's 15-6 well. BP's counsel emphasized the erroneously admitted evidence during closing argument:

These are Queen floods. They are injecting into the Queen interval, which is close to – I won't say it is exactly the same, but it is close to the same interval, 3,900 foot interval where the water flow occurred.

And look at the pressures they are injecting. And look at the bottom-hole pressures, 4,400 pound there, 4,162.

The significant thing was Dr. Cobb said that when you get to 70 – .7 to maybe .75 ratio of bottom-hole pressure per foot, this column, that you run the risk of fracking the formation, if it gets above 7 or 7.5. And that puts cracks – or can put cracks in the formation. And then the water follows the cracks and can go just about – and the pressure can follow the cracks and go just about anywhere.

As the only evidence implying the conclusion that the Queen projects caused the water flow in the 15-6 well, Williamson's and Dr. Cobb's testimony about the injection pressures in the Queen floods was crucial to the causation issue. The emphasis placed on that testimony by BP's counsel certainly urged the jury to arrive at such a conclusion without expert testimony, only argument by counsel, supporting that conclusion.

Whether BP violated the applicable standard of care was another key issue at trial. As stated above, Discovery was required to establish with expert testimony the standard of care and BP's violation of that standard. The erroneously excluded testimony by Don Sparks was the only expert

testimony that BP violated the standard of care. As the only expert testimony, the excluded evidence was critical to Discovery's proof of its negligence claim and was crucial to a key issue.

As a result of erroneously admitted evidence, Discovery faced two new opinions that were crucial to the causation issue. As a result of the erroneously excluded evidence, Discovery could not present expert testimony that was crucial to the issue of whether BP violated the standard of care. Based on the crucial nature of the erroneously admitted evidence, the emphasis that BP's counsel placed on the erroneously admitted evidence, and the crucial nature of the erroneously excluded evidence, we conclude that the trial court's evidentiary errors probably caused the rendition of an improper judgment and were, therefore, harmful. We sustain Discovery's first three issues in Cause No. 11-08-00171-CV and remand the cause to the trial court for a new trial.

*BP's Cross-Points*

BP presents two cross-points for review. In its first cross-point, BP contends that Discovery lacks standing and capacity to assert the claims in Cause No. 11-08-00171-CV. In its second cross-point, BP contends that Discovery failed to comply with the requirements under *Daubert* and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995), for admission of expert testimony on causation. Specifically, BP contends that Discovery's experts, Dr. MacDonald and Platt, failed to rule out alternative causes of the water flow in the 15-6 well and that, therefore, their causation testimony should have been excluded.

*Discovery's Standing and Capacity to Sue*

A party must have both standing and capacity to bring a lawsuit. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). Standing is a component of subject-matter jurisdiction, and it is not to be confused with capacity. *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Id.* Capacity concerns "a party's personal right to come into court," while standing concerns "the question of whether a party has an enforceable right or interest." *Lovato*, 171 S.W.3d at 849 (quoting 6A CHARLES ALAN WRIGHT ET AL, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1559, at 441 (2d ed. 1990)); *Avco Corp., Textron Lycoming Reciprocating Engine Div. of Avco Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 649 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

BP contends that Discovery lacks standing because it failed to prove that it owned the mineral estate in Section 15. Don Sparks testified that Discovery obtained an oil and gas lease from Apache Company covering 480 acres in Section 15, and Discovery introduced into evidence a copy of the lease. BP relies on *Murphy v. Tribune Oil Corp.*, 656 S.W.2d 587, 589 (Tex. App.—Fort Worth 1983, writ dism'd), in arguing that the evidence was insufficient to establish Discovery's standing to maintain its suit. In *Murphy*, the plaintiffs alleged that they were successors in title to the mineral estate in certain properties. The defendants owned the surface estate of the land in question. The plaintiffs sought and obtained from the trial court a temporary injunction that prohibited the defendants from denying them access to the subject mineral interests. *Murphy*, 656 S.W.2d at 588. On appeal, the defendants asserted that there was no evidence or insufficient evidence that the plaintiffs had title to or any other form of right in the subject mineral estate. *Id.* At the temporary injunction hearing, the plaintiffs had not offered as evidence any written documentation to prove that they were successors in title to the mineral estate. Instead, they sought to prove their status solely through oral testimony. *Id.* at 589. The court of appeals concluded that title to the minerals was directly in issue in the case and stated the rule that, "[w]here title to real property is directly in issue, proof of title must be made by written instruments." *Id.* Therefore, the court held that the oral testimony constituted no evidence that the plaintiffs had any right or title to the mineral interests, and the court dissolved the injunction. *Id.*

Based on the rule stated in *Murphy*, BP asserts that Discovery had the burden to prove the chain of title to the minerals in Section 15 – apparently from the sovereign to it – by written instruments. Because Discovery did not introduce into evidence a written instrument proving that Apache owned the minerals at the time of its lease to Discovery, BP contends that Discovery failed to meet its burden. BP states in its brief that, "[f]or all that [it] knows, Discovery may have a fatal defect in the prior chain of title."

This case is factually distinguishable from *Murphy*. Discovery did not rely solely on oral testimony to prove its ownership of the mineral interests. Discovery presented the written lease agreement as evidence supporting its ownership claim. *See Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003) (An oil and gas lessee acquires ownership of all the minerals in place that the lessor owned and purported to lease.). The oil and gas lease, which was effective January 2, 2001, covered the mineral interests in 480 acres in Section 15. Discovery named the lease

its "Geronimo lease." In addition to the lease agreement, Discovery presented ample evidence supporting its ownership of the minerals. The evidence showed that Discovery entered the Geronimo lease and drilled five wells on it over a period of about two years before drilling the 15-6 well. There was no evidence that any party ever denied Discovery access to the mineral interests. Assuming that the rule stated by the *Murphy* court applies to this case, we conclude that the written lease agreement, coupled with the other evidence supporting Discovery's ownership of the mineral interests, satisfied any burden on the part of Discovery to prove its title.

We also conclude that title to the minerals is not directly in issue in this case. This case does not involve competing claims to the mineral interests; it is not a trespass to try title case in which the purpose of the suit is the recovery of title. In fact, there were no pleadings or evidence that any party other than Discovery owned the minerals. Based on these facts, title to the minerals is not directly in issue. *Brown v. Brown*, 520 S.W.2d 571, 577 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ dism'd); *Zieben v. Krakower*, 346 S.W.2d 401, 405 (Tex. Civ. App.—Houston [1st Dist.] 1961, writ ref'd n.r.e.). Instead, title to the minerals is only incidentally involved as a predicate to Discovery's recovery of monetary damages. Where title is only incidentally involved, proof of ownership may be proven with any character of evidence that tends to establish that fact, including oral testimony. *Brown*, 520 S.W.2d at 577. For example, a deed is prima facie evidence of a grantee's ownership. *In re Marriage of Murray*, 15 S.W.3d 202, 205 (Tex. App.—Texarkana 2000, no pet.); *Zieben*, 346 S.W.2d at 405. And, possession of real property is prima facie evidence of ownership. *Zieben*, 346 S.W.2d at 405; *Garner v. McKinney*, 255 S.W.2d 529, 531 (Tex. Civ. App.—Eastland 1953, writ ref'd n.r.e.).

Discovery met its burden to establish that it owned the subject mineral interests. The evidence demonstrated that Discovery has standing and capacity to sue. We overrule BP's first cross-point.

### Exclusion of Queen Floods as Cause of the Water Flow

In its second cross-point, BP contends that Discovery's experts failed to eliminate the Queen projects as potential causes of the water flow in the 15-6 well and that, therefore, their causation testimony should have been excluded. Trial courts may consider several factors when determining whether expert testimony is reliable. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997); *Robinson*, 923 S.W.2d at 557-59. One such factor is whether the expert conducted

testing to exclude other possible causes of the damage. *Robinson*, 923 S.W.2d at 558-59; *Wyndham Int'l, Inc. v. Ace Am. Ins. Co.*, 186 S.W.3d 682, 685 (Tex. App.—Dallas 2006, no pet.). Thus, an expert who is trying to find a cause of something should carefully consider alternative causes. *Robinson*, 923 S.W.2d at 559. An expert's failure to rule out other causes of damage may render his or her opinion little more than speculation. *Robinson*, 923 S.W.2d at 559; *Wyndham*, 186 S.W.3d at 689.

Dr. MacDonald testified that he investigated the waterflood projects that were located within about five miles of Discovery's 15-6 well. His investigation included the Queen projects, which were located in the Moose Queen reservoir, the Concho Bluff Queen reservoir, and the Concho Bluff North Queen reservoir. The Queen projects were about five miles away from the 15-6 well. Dr. MacDonald testified that, in contrast, the War-San project, which contained BP's 25 well, was about a mile away from the 15-6 well.

Dr. MacDonald testified that he was interested in comparing the amount of water and oil produced from the project areas with the amount of water injected into the project areas. Dr. MacDonald said that he reviewed Railroad Commission records to make these comparisons. Using these records, Dr. MacDonald computed an injection-to-production ratio for each of the projects that he studied. Dr. MacDonald testified that he initially considered data for the projects from 1982 forward. Using this data, none of the Queen projects had an injection-to-production ratio that exceeded 1 to 1. Dr. MacDonald said that it was significant that the ratios did not exceed 1 to 1 because "if that ratio is less than one, the likelihood that the water that's being injected into those reservoirs will escape is significantly less than those reservoirs in which the injected water exceeds, and substantially exceeds the amount of volume that was taken out of that reservoir." Based on the injection ratios in the Queen projects and "their proximity being somewhat removed from the 15-6 well," Dr. MacDonald concluded that they could be eliminated as the cause of the water flow in the 15-6 well.

During cross-examination at the *Daubert* proceedings, Dr. MacDonald acknowledged that Railroad Commission Bulletin 82 showed pre-1982 data for the Queen injection projects. In a later *Daubert* appearance, Dr. MacDonald testified that he had then included data going back to 1972 in his study. Dr. MacDonald prepared a graph showing his findings. At trial, Dr. MacDonald testified about the graph, and Discovery introduced the graph into evidence. Dr. MacDonald testified that

the graph showed "the cumulative injection in barrels of water, divided by the cumulative production of oil plus water, in time." The inclusion of the pre-1982 data resulted in the injection-to-production ratios being higher in the Queen projects. The graph showed (1) that the injection-to-production ratio for the Concho Bluff Queen projects peaked at about 1.8 to 1 in the early 1990s and had come down to about 1.7 to 1 in 2003 when Discovery drilled the 15-6 well, (2) that the injection-to-production ratio for the Concho Bluff North Queen projects peaked at about 1.5 to 1 in 1985 and had come down to about 1.3 to 1 in 2003, and (3) that the injection-to-production ratio for the Moose Queen projects peaked at about 1 to 1 in 1982 and had come down to about 0.8 to 1 in 2003. Dr. MacDonald testified that the injection-to-production ratio for the War-San project was 3.5 to 1 in 2003.

Dr. MacDonald testified that the inclusion of the pre-1982 data in his study did not change his opinion that the waterflood projects he studied, other than the War-San project, could be ruled out as causes of the water flow in the 15-6 well. He testified that the injection-to-production ratios in the other projects, which included the Queen projects, had remained relatively constant since 1975. He said that a constant injection-to-production ratio indicates that there is a "balance between production and injection" and that, when such a balance exists, there is "no inclination for . . . any leakage to occur from the system." Dr. MacDonald testified that, in his opinion, based on the 3.5 to 1 injection-to-production ratio in the War San project, the period of time that the injection-to-production ratios had remained constant in the other projects, and the distance from the other projects to the 15-6 well, the other projects could be excluded as possible causes of the water flow in the 15-6 well. He said that the lack of proximity between the other projects and the 15-6 well was an important consideration because "it has to be transmitted over a longer distance, plus the fact it has to find a connected path across that distance," and that, therefore, "the probability is much lower, as the distance increases from the 15-6 well."

Platt also testified about Discovery's investigation of the surrounding waterflood projects. He said that he gathered H-1 forms, H-10 forms, and other reservoir information and provided the information to Dr. MacDonald to use in his study of the waterflood projects. Platt said that Dr. MacDonald tabulated the information and performed the calculations of the injection-to-production ratios. Platt testified that he and Dr. MacDonald studied the War-San project and other projects in the area of the 15-6 well. He said that the other projects were a considerable distance

away from the 15-6 well and that Discovery studied the other projects "to eliminate [them] as a potential source of pressure for the water flow in the 15-6 well, both by distance away, remote locations, and by [Dr. MacDonald's] study of [their] injection/production ratios." Platt testified that the distance between the other projects and the 15-6 well was a significant consideration because "any type of pressure response ha[d] a much longer distance to travel from these projects that are further away" and that, "the further away you get from the 15-6, the less likely that is of some source." Platt concluded that, in his opinion, "the other projects four to five miles away were not the source of the pressure increase that we saw at the 3,900 foot zone in the 15-6 well that resulted in the water flow at that well."

The evidence showed that Dr. MacDonald and Platt investigated the Queen projects in an effort to exclude them as a possible cause of the water flow in the 15-6 well. Based on that investigation, Dr. MacDonald and Platt testified that the Queen floods could be excluded as a cause of the water flow. The reliability factor – whether the expert conducted testing to exclude other possible causes of the damage – supports the admissibility of the causation testimony of Discovery's experts. We overrule BP's second cross-point.

### This Court's Ruling

We reverse the judgments of the trial court in these causes and remand them to the trial court for new trial.


TERRY McCALL
JUSTICE


April 15, 2010

Panel consists of: Wright, C.J.,
McCall, J., and Boyd, S.J.[10]

---

[10]John T. Boyd, Retired Chief Justice, Court of Appeals, 7th District of Texas at Amarillo, sitting by assignment.